1  Jonathan A. Dessaules, Cal. Bar No. 214650
   CHRISTIAN DICHTER & SLUGA, P.C.
2  2700 North Central Avenue, Suite 1200
   Phoenix, Arizona 85004
3  Telephone:  (602) 792-1700
   Facsimile:  (602) 792-1710
4  jdessaules@hcdslaw.com

5  *Attorney for Defendants*

6  [Additional Counsel Appear on Signature Page]

7            **UNITED STATES DISTRICT COURT**

8            **CENTRAL DISTRICT OF CALIFORNIA**

9  NBTY, INC., a Delaware corporation;
   NBTY ACQUISITION, LLC d/b/a
10 LEINER HEALTH PRODUCTS, a
   Delaware limited liability company, and
11 NBTY MANUFACTURING, LLC, a
   Delaware limited liability company,
12
              Plaintiffs,
13     vs.
14 SOUTHWEST FOREST PRODUCTS,
   INC., an Arizona corporation;
15 SOUTHWEST FOREST PRODUCTS
   TRANSPORTATION, INC., an Arizona
16 corporation, and DOES 1-10, inclusive,
17            Defendants.
18
19
20
21
22
23
24
25
26
27
28

No. CV2012-00872-GHK-MRW

**JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT AND PRECLUSION OF
EVIDENCE**

Date:      December 31, 2012
Time:      9:30 a.m.
Place:     Courtroom 650

The Honorable George H. King

Pursuant to Federal Rules of Civil Procedure 56, the Local Rules of this Court, and this Court's Order Re: Summary Judgment Motions, the parties hereby submit this Joint Brief Re: Defendants' Motion for Summary Judgment and Plaintiffs' Partial Motion for Summary Judgment. The parties hereby certify that, pursuant to Local Rule 7-3, the parties participated in an in-person conference during which each issue to be raised in the motion(s), as well as the law and evidence relevant to each respective issue, were discussed.  The parties further certify that they complied with Local Rule 16-15 by the October 26, 2012 deadline by mediating the case through the Federal Mediation Panel (Denise Madigan) and continuing to discuss settlement thereafter.

Dated: November 30, 2012

CHRISTIAN DICHTER & SLUGA, P.C.

By:   /s/ Jonathan A. Dessaules
      Jonathan A. Dessaules,
      Cal. Bar No. 214650
      *Attorneys for Defendants*

Dated: November 30, 2012

LEB DISPUTE RESOLUTIONS

By:   /s/ Michael H. Leb
      Michael H. Leb,
      Cal. Bar No. 123042
      170 S. Euclid Ave.
      Pasadena, California  91106
      michael@lebdr.com
      626-765-6003
      *Attorneys for Plaintiffs*

## NOTICE OF MOTION AND
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PRECLUSION OF EVIDENCE

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on December 31, 2012, at 9:30 a.m., or as soon thereafter as this matter can be heard before the Honorable George H. King of the United States District Court for the Central District of California, in Courtroom 650 of the above-entitled Court, located at 312 North Spring Street, Los Angeles, California 90012, Defendant Southwest Forest Products, Inc. will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment in its favor and against Plaintiff NBTY Acquisition, LLC and Plaintiff NBTY Acquisition, LLC will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting partial summary judgment in its favor and against Defendant Southwest Forest Products, Inc..

Defendants' Motion for Summary Judgment is made on the basis that (a) NBTY has presented no evidence that the delivered pallets failed to conform to the material terms of the contract (namely, that the moisture content be at 19% or less), (b) the kiln-dried requirement is not a term of the contract and, even if it is, is not material, (c) no competent, admissible evidence of mold, and (d) failure to present proper evidence of damages.

Plaintiffs' Motion for Partial Summary Judgment is made on the grounds that the undisputed facts entitle Plaintiff NBTY Acquisition, LLC ("NBTY") to judgment as a matter of law on its claim for breach of contract in the amount of $109,279.29.  Plaintiff further moves for preclusion of evidence regarding the alleged moisture content of the pallets at issue in this case on the grounds of "spoliation" of evidence as the undisputed

- 1 -

1  facts demonstrate Defendant negligently (at least) disposed of the pallets after it knew

2  that litigation was likely.

3  Dated: November 30, 2012                    Dated: November 30, 2012

4  CHRISTIAN DICHTER & SLUGA, P.C.             LEB DISPUTE RESOLUTIONS

5  By:   /s/ Jonathan A. Dessaules            By:   /s/ Michael H. Leb

6         Jonathan A. Dessaules,                    Michael H. Leb,
          Cal. Bar No. 214650                        Cal. Bar No. 123042
7         *Attorneys for Defendants*                 *Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

JOINT MEMORANDUM OF POINTS & AUTHORITIES ............................................. 1

I.   BRIEF FACTUAL OVERVIEW RELATING TO ALL MOTIONS ................. 1

II.  CROSS MOTIONS – SFP's MOTION FOR SUMMARY JUDGMENT;
     NBTY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
     BREACH OF CONTRACT CLAIM ONLY ....................................................... 1

     A.   Introduction and Summary of Argument. ................................................. 1

          1.   SFP's Introduction and Summary of Argument ............................. 1

          2.   NBTY's Introduction. ...................................................................... 3

     B.   Count One – Breach of Contract. .............................................................. 7

          1.   Defendant's Position: NBTY's Breach of Contract Claim Fails
               as a Matter of Law For Several Reasons. ........................................ 7

               a.   The Terms of the "Contract." .................................................. 7

               b.   The Contract Did Not Contain a Moisture Content
                    Requirement, But If It Did NBTY Has Not Shown that
                    the Delivered Pallets Failed to Conform to the
                    Contract. ................................................................................ 12

               c.   The Kiln-Dried Requirement, If It Was Even a Contract
                    Term, Is A Red Herring and Cannot Support a Claim for
                    Breach of Contract. ............................................................... 16

               d.   The Alleged "Discoloration" Was Not a Breach. ............... 19

               e.   No Basis Existed for NBTY to Reject or Revoke
                    Acceptance. ........................................................................... 22

               f.   Joe McCarron's Testimony Does Not Support a Claim for
                    Breach. ................................................................................... 22

          2.   NBTY's Position: NBTY is entitled to Judgment in its Favor
               on the Breach of Contract Claim and SFP's Motion Must
               Be Denied ....................................................................................... 25

# TABLE OF CONTENTS
## (continued)

**Page**

        a.    The Undisputed Facts show that SFP Breached Its Contract to Provide pallets built with Kiln-Dried wood to NBTY ......................................................................... 25

        b.    Undisputed Facts Preclude Judgment in SFP's Favor on the Breach of Contract Claim. ............................................. 28

  C.    Count Two – Breach of Covenant of Good Faith and Fair Dealing........ 31

      1.    Defendant's Position: The Breach of Covenant of Good Faith and Fair Dealing Claim Is Simply Duplicative of the Breach of Contract Claim and Fails as a Separate Cause of Action. ............. 31

      2.    NBTY's Position. .......................................................................... 32

  D.    Counts Three and Four – The Breach of Warranty Claims. .................... 34

      1.    Defendant's Position: Plaintiffs' Breach of Warranty Claims Fail for Lack of Evidence. ................................................................... 34

      2.    NBTY's Position. .......................................................................... 36

  E.    Damages. ................................................................................................. 37

      1.    Defendant's Position: Plaintiff Has Not Disclosed Any Evidence of Actual Damages Sufficient to Overcome Summary Judgment. ...................................................................................... 37

      2.    NBTY's Position. .......................................................................... 42

III.    CONCLUSION................................................................................................ 45

  A.    Defendant's Conclusion. ......................................................................... 45

  B.    NBTY's Conclusion. ............................................................................... 45

1

## TABLE OF AUTHORITIES

2

Page(s)

3  *511 West 232nd Owners Corp. v. Jennifer Realty Co.,*
4      98 N.Y.2d 144 (2002) ...................................................................... 32

5  *Albrecht Chemical v. Anderson Trading Corp.,*
6      289 N.Y. 437 (1949) ........................................................................ 39

7  *Barry Mallin & Associates, P.C. v. Nash Metalware Co. Inc.,*
       18 Misc.3d 890, 849 N.Y.S.2d 752 (2008)...................................... 10
8
9  *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.,*
       361 F.Supp.2d 283 (S.D.N.Y. 2005) ............................................... 33

10 *Bishop v. Hyundai Motor Amer.,*
11     44 Cal.App. 4th 750 (1996) ............................................................. 38

12 *Cambridge Electronics Corp. v. MGA Electronics, Inc.,*
13     227 F.R.D. 313 (C.D. Cal. 2004) ............................................... 37, 43

14 *Cary v. Automobile Ins. Co. of Hartford, Connecticut,*
15     838 F. Supp. 2d 1117 (D. Colo. 2011)........................................ 3, 20

16 *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.,*
17     873 F. Supp. 808 (S.D.N.Y. 1994) .................................................. 32

18 *Crowe v. BellSouth Telecomms., Inc.,*
       No. 3:08cv179–WC, 2009 WL 1850189 (M.D.Ala. June 26, 2009)................ 42
19
20 *D.J.C. Group Corp. v. Woolrich, Inc.,*
       1995 WL 662123 (S.D.N.Y. Nov. 9, 1995)..................................... 39
21
22 *Gallagher v. Crystal Bay Casino, LLC,*
       2010 WL 4669399 (D. Nev., Nov. 8, 2010) ...................................... 7

23 *Gordon v. Leonetti,*
24     324 F.2d 491 (2d Cir. 1963) .............................................................. 7

25 *Gorman v. Wolpoff & Abramson*, LLP,
26     552 F.3d 1008 (9th Cir.2009) ........................................................... 42

27 *Harlan Associations v. Incorporated Village of Mineola,*
       273 F.3d 494 (2d Cir. 2001) ...................................................... 13, 22
28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hudson Ins. Co. v. Ovitt,*
      879 F.2d 865 (9th Cir. 1989) ...................................................................... 2, 38

*In re Hitachi Television Optical Block Cases,*
      2011 WL 3563781 (S.D. Cal. 2011) .................................................................. 14

*In re Slatkin,*
      310 B.R. 740 (C.D. Cal. 2004) ......................................................................... 37

*Ingram v. Guideone Mut. Ins. Co.,*
      2007 WL 4165361 (S.D. Miss. 2007)............................................................ 3, 21

*J.P. Morgan Chase v. J.H Elec. Of New York, Inc.,*
      69 A.D. 3d 802 (N.Y. Sup. Ct. 2005) ................................................................ 7

*Jackson v. Pressnell,*
      19 Ariz.App. 221, 506 P.2d 261 (Ariz.Ct.App.1973)....................................... 42

*Kemmerer v. State Farm Ins. Co.,*
      2004 WL 87017 (E.D. Pa. 2004) .................................................................. 3, 20

*Kraft Reinsurance Ireland Ltd. v. Pallets Acquisitions, LLC*
      (N.D. Ga. 2011) 845 F.Supp.2d 1342 .......................................................*passim*

*Kurtz v. Chicorp Financial Services,*
      286 A.D.2d 753, 731 N.Y.S.2d 187 (2nd Dept. 2001) .................................. 3, 21

*Leggio v. Gearhart,*
      294 A.D. 543, 743 N.Y.S.2d 135 (2002) .......................................................... 13

*Leon v. IDX Sys. Corp.,*
      464 F.3d 951 (9th Cir.2006) ............................................................................. 6

*Lumoa v. Potter,*
      351 F. Supp. 2d 426 (M.D. N.C. 2004) ........................................................... 24

*Luna v. Sears Life Ins. Co.,*
      2008 WL 2484596 (S.D. Cal. 2008)................................................................. 38

1

## TABLE OF AUTHORITIES
### (continued)

2

Page(s)

3

*Martin v. Chuck Hafner's Farmers' Market, Inc.*,
   28 A.D.3d 1065 (N.Y. App. Div. 2006) ............................................................ 36

4

5

*Menendez v. Faber, Coe & Gregg, Inc.*,
   345 F. Supp. 527 (S.D.N.Y. 1972) .................................................................... 39

6

7

*Menorah Home and Hospital v. Fireman's Fund Insurance Company*,
   2011 WL 6337640 (2nd Cir. 2011) ...................................................... 38, 39, 43

8

9

*Milcor Steel Co. v. Grantier*,
   34 Misc.2d 496 (N.Y. Co. Ct. 1942) ................................................................ 36

10

11

*Missigman v. USI Northeast, Inc.*,
   131 F. Supp.2d 495 (S.D.N.Y. 2001) ............................................................... 10

12

13

*Nelson v. Pima County Community College*,
   83 F.3d 1075 (9th Cir. 1996) ..................................................................... 13, 22

14

15

*Noetzli v. Naghi*,
   2011 WL 1087239 (Cal. Ct. App. Mar. 25, 2011) ........................................ 3, 21

16

*Palomo v. Trustees of Columbia University in City of New York*,
   170 Fed. Appx. 194 (2nd Cir. 2006) ................................................................ 24

17

18

*Phoenix Payment Solutions, Inc. v. Towner*,
   2009 WL 3241788 (D. Ariz., Oct. 2, 2009) ..................................................... 43

19

20

*Premier Mountings, Inc. v. Clyde Duneler, Inc.*,
   51 UCC Rep. Serv. 2d 1033 (2003) ................................................................. 10

21

22

*Qualls v. State Farm Lloyds*,
   226 F.R.D. 551 (N.D. Tex. 2005) .................................................................... 21

23

24

*Richbell Information Services, Inc. v. Jupiter Partners, L.P.*,
   309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dept. 2003) ...................................... 32

25

26

*Ryan v. Ltd. West, Inc.*,
   2007 WL 4577867 (C.D. (al. 2007) ................................................................. 31

27

28

1

### TABLE OF AUTHORITIES
#### (continued)

2

Page(s)

3

*Sarwick Motor Sales, Inc. v. Husband*,

4
    5 Ariz. App. 304, 426 P.2d 404 (Ariz.Ct.App.1967).........................................43

5

*Schwartz v. Marcose Lumber*,

6
    50 Misc. 2d 547, 270 N.Y.S.2d 875 (1966)..................................................34, 35

7

*Silber v. New York Life Insurance Company*,

8
    938 N.Y.S.2d 46 (2012)......................................................................................10

9

*SNCB Corporate Finance Ltd., v. Schuster*,
    877 F. Supp. 820 (S.D.N.Y. 1994) ....................................................................24

10

*Suroweic v. Capital Title Agency, Inc.*,

11
    790 F. Supp. 2d 997 (D. Ariz. 2011) .................................................................15

12

*U.S. Leasing Corp. v. Comerald Associates, Inc.*,

13
    101 Misc.2d 773, 421 N.Y.S.2d 1003 (1979).....................................................35

14

*United Air Lines, Inc. v. Wiener*,

15
    335 F.2d 379 (9th Cir. 1964) ...............................................................................1

16

*United States v. $40,955.00 in U.S. Currency*,

17
    554 F.3d 752 (9th Cir. 2009) .............................................................................15

18

*Vigorito v. Allard*,

19
    118 A.2d 906 (Conn. 1955) ...............................................................................10

20

*Westerdahl v. Wiliams*,

21
    276 F.R.D. 405 (D. N.H. 2011) ...................................................................39, 42

22

*Williams v. City of Bremerton*,
    2001 WL 36101298 (W.D. Wash. 2001)...........................................................42

23

24

25

26

27

28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

New York's Uniform Commercial Code

§ 2-207 .................................................................................. 11, 12

§ 2-313 ...................................................................................... 17

§ 2-314 ...................................................................................... 34

§ 2-314(2)(c) ............................................................................. 34

§ 2-315 ...................................................................................... 35

§ 2-602 .................................................................................. 7, 22

§ 2-602(1) ................................................................................. 17

§ 2-605(1) ................................................................................. 18

§ 2-608 ........................................................................................ 7

§ 2-712 ...................................................................................... 37

§ 2-714 ...................................................................................... 37

§ 2-715 .................................................................................. 37, 38

Federal Rules of Civil Procedure

Rule 37(c)(1) .......................................................................... 39, 42

Federal Rules of Evidence

Rule 803(b)(6) ............................................................................. 43

1        **JOINT MEMORANDUM OF POINTS & AUTHORITIES**

2  **I.**     **BRIEF FACTUAL OVERVIEW RELATING TO ALL MOTIONS.**

3        This case arises out of a transaction involving the sale of goods governed by New

4  York law. Defendant Southwest Forest Products, Inc. ("SFP") agreed to sell, and Plaintiff

5  NBTY Acquisition, LLC ("NBTY")[1] agreed to buy, wood pallets for a "fence front"

6  product display at various Costco stores. SFP delivered the pallets in a series of

7  shipments starting September 29, 2010 to be shrink-wrapped with product displays

8  placed atop of each pallet. NBTY contends that, on or about October 22, 2010, it

9  observed what it believes was black mold[2] on the pallets and product displays it was

10  constructing for Costco.  SFP retrieved the pallets and did not charge NBTY.  NBTY,

11  however, contends it, nevertheless suffered "cover" damages caused by SFP.

12  **II.**    **CROSS MOTIONS – SFP's MOTION FOR SUMMARY JUDGMENT;**
13        **NBTY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIM ONLY.**

14      **A.**     **Introduction and Summary of Argument.**

15          1.    SFP's Introduction and Summary of Argument.

16        NBTY alleges that the pallets were "wet, moldy and caused mold to grow" on both

17  the pallets and product displays. NBTY contends that the "excessive amount of moisture"

18  and alleged mold growth is actionable under four separate contract theories: breach of

19  contract, breach of the covenant of good faith and fair dealing, breach of the implied

20  warranty of merchantability, and breach of the implied warranty of fitness for a particular

21  purpose.[3] NBTY's claims are all fatally deficient, and summary judgment should be

22  entered for SFP for several reasons.

23  ––––––––––––––––––

24     [1] Pursuant to stipulation, Plaintiffs NBTY, Inc. and NBTY Manufacturing, LLC and Defendant Southwest Forest Products Transportation, Inc. are dismissed with a mutual waiver of costs.

25 
26     [2] Plaintiff alleges in this case that the pallets from SFP were "wet, moldy and caused mold to grow" on the pallets and product displays.   Complaint, ¶¶ 19, 20.

27     [3] NBTY erroneously plead claims three and four under California's UCC.  The parties agree New York law applies with respect to the substantive issues and that NBTY does not have

28 

First, NBTY cannot meet its burden of proving that the pallets failed to conform to the terms of the relevant contract or otherwise breached any express or implied term in the contract. The contract did not impose any maximum moisture content for the pallets and, even if one reads the industry standard moisture content of 19% into the contract, NBTY has no competent, admissible evidence that the moisture content of the sold pallets exceeded that moisture level. NBTY's argument that the pallets were required to be kiln-dried, as opposed to air-dried, is likewise a red herring as NBTY was unaware of such a requirement at the time of contract formation and, in any event, "kiln-dried" merely refers to one method for reducing moisture content in prefabricated wood and does not specify any particular moisture content. "Kiln-dried" does not mean dried to a specific moisture level and, in any event, the absence of kiln-drying did not constitute a breach as Plaintiff has not shown that it resulted in non-conforming pallets.

Second, NBTY has proffered no competent evidence that the discoloration it contends appeared on the pallets several weeks after delivery was "mold" or that the pallets were the source of the so-called "mold." The mere appearance of discoloration, without more, is insufficient as a matter of law to establish liability under any of the legal theories asserted in the Complaint. Third, NBTY has not disclosed any competent, admissible evidence of damages. Self-serving spreadsheets and screenshots of alleged purchase orders are not evidence of what NBTY actually incurred, or paid, as a result of the allegations set forth in the Complaint.

Finally, unable to avoid the evidentiary problems with its case, NBTY now argues that the Court should award summary judgment to NBTY on a theory of spoliation of evidence. Although it failed to test the pallets for moisture during the several months the pallets were in its exclusive possession or when it first observed the discoloration, NBTY

to replead these claims. The parties agree that federal law, not New York law, governs all procedural and evidentiary issues. *See Hudson Ins. Co. v. Ovitt*, 879 F.2d 865 (9th Cir. 1989) ("The admissibility of evidence is a procedural matter guided by federal law"); *United Air Lines, Inc. v. Wiener*, 335 F.2d 379, 391 (9th Cir. 1964) (local law governs procedural issues).

1  argues that SFP should have retained possession of the pallets for testing after they had

2  been left outside, exposed to the elements at NBTY's warehouse. The Court should

3  summarily reject this meritless, eleventh-hour attempt to overcome its own evidentiary

4  shortcomings.

5        Each of the foregoing reasons independently compels summary judgment for SFP.

6          2.   <u>NBTY's Introduction.</u>

7        NBTY ordered "dry" pallets from SFP.  SFP delivered "wet" pallets?[4]  Because the

8  pallets were "wet," a substance that appeared to be "black mold" grew on the pallets and

9  on the product displays built on the pallets for delivery to Costco.[5]  SFP retrieved the

10  pallets and, ultimately, NBTY was not charged for them. NBTY, however, incurred

11  "cover" damages (*i.e.* the additional cost of procuring replacement pallets, plus the cost

12  

---

13      [4] The terms "dry" and "wet" in the pallet industry are terms of art referring to a pallet's estimated moisture content ("EMC").  Dry pallets have an EMC of 19% or below. Evidentiary
14  Appendix ("Appendix") at Exhibit A (McCarron Dep., 29:17-19); Appendix at Exhibit B (Steve Van Der Toorn Dep. 15:14-16).

15      [5] Appendix at Ex. 22 (Rubalcava Declaration and Photographs).  Joe McCarron
16  ("McCarron") SFP's Vice President of Sales at the time, admitted "there was a black fur substance growing on the pallets. . . that looked like the mold in any moldy bathroom." (Appendix at Exhibit A; McCarron Dep. 103:17-19, 118:18-24). McCarron met with NBTY and
17  viewed what appeared to be mold on the pallets on October 25, 2010 after being informed of the problem.  Appendix at Ex. A (McCarron Dep 45:5-21;48:16-19).  Given the testimony about the
18  substance on the pallets and the photographic evidence, SFP's insistence on referring to the growth of this black stuff on the pallets as "discoloration" is disingenuous.

19      The cases – footnotes 65-68 - cited by SFP to support the argument that expert
20  testimony is required to dispute SFP's assertions about the substance growing on the pallets are inapposite.  In *Kurtz*, the court **denied summary judgment** in a "mold" case finding disputed
21  issues of fact because defendant presented no evidence to dispute the plaintiff's evidence regarding the mold or causation for the alleged injuries.  In *Noetzli*, a California case with no
22  relevance here, the court simply noted that plaintiff did not retain an expert.  Nowhere does the court even hint at the idea that expert testimony is required in a case like ours. *Qaulls* applied
23  Texas law in a case involving specialized equipment on a refrigerated trailer.  *Cary* was a ruling allowing expert testimony in a case involving "[h]ow one tests for the presence of mold in a
24  home, the results of such testing, and how best to remediate mold if it is present".  SFP conveniently relied on an ellipsis to distort the ruling which, in any event, does not come close
25  to saying that an expert is required to identify a substance that "looks like mold" on a piece of wood. *Ingram* held that an expert was required to "prove mold infestation in their home was
26  caused by damages from Hurricane Katrina or some other covered event."  *Kemmerer* was a case *requiring* proof that "a numerated specified peril under [plaintiff's] homeowner's policy
27  caused the mold infestation and resulting property damage.

28

of new display materials, and the labor cost for breaking down the unusable displays, disposing of the wasted material, and rebuilding new displays).

Notwithstanding NBTY's efforts to resolve this matter, SFP has insisted on having its "day in court."  So here we are.  But, as we will demonstrate below, SFP has it backwards.  Not only is SFP not entitled to summary judgment, but also NBTY is entitled to partial summary judgment in its favor on its claim for breach of contract. This claim comes down to a determination of whether delivery of pallets made with "kiln-dried" wood was required under the contract. And, on this key issue, the testimony could not be clearer.  Scott Van Der Toorn, SFP's Executive Vice President ("Scott"), admitted that Costco's Structural Packaging Specifications (revised 8/01/2010) were part of the agreement.[6] These specifications require kiln drying of soft wood.  The pallets were made of soft wood.[7]  SFP did not kiln-dry the wood. Q.E.D. The undisputed facts demonstrate SFP breached the contract.[8]

SFP's motion for summary judgment must be denied.[9]  Even if this Court concludes NBTY is, for some reason, not entitled to summary judgment on the contract claim despite black-letter contract language requiring "kiln-dried" pallets and SFP's admission that the pallets were not "kiln-dried," the evidence presented by NBTY certainly raises a triable issue of fact on that claim.  SFP's motion on the claim for breach

---

[6]  Appendix at Exhibit B (Scott Dep., 103:1-14, 105:14-18, 106:5-9, 108:24-14); Appendix at Ex. 16.  Scott could hardly contend otherwise.  The Purchase Orders, which the parties have stipulated were part of the contract, specifically state "Meets January 2011 Costco Pallet Specs."  Appendix at Ex. 13.

[7]  Appendix at Exhibit B (Scott Dep. 67:11-19).

[8]  This is not a case where, if both parties are moving for summary adjudication on the same cause of action, there must be a disputed issue of fact.  SFP's strategy here is clear. Muddy the waters with irrelevant snippets of deposition testimony hoping this Court will not read the specifications (Ex. 16) but simply throw up its hands and wait to hear from the witnesses at trial.  Neither party has requested a jury.  This will be a bench trial.

[9]  SFP's motion for judgment on this claim is based on SFP's erection of a "straw man" which it then proceeds, unsuccessfully, to topple.  The straw man here is SFP's assertion that the contract has no moisture content requirement and, even if it did NBTY cannot prove the pallets did not meet that specification.  NBTY dispatches this argument in section B(2)(b), *infra*.

- 4 -

of the covenant of good faith and fair dealing fails because, contrary to SFP's assertion, this claim is not duplicative.  Finally, SFP's motion on the UCC claims fails because, leaving aside the clear breach of contract, this case boils down to a resolution of many factual disputes about whether the pallets were "wet" or "dry," whether the "mold" was caused by SFP, and whether NBTY timely and properly revoked its acceptance.  These issues preclude summary judgment.

NBTY also moves for an order precluding SFP from offering evidence concerning the moisture content of the pallets.  Our case is quite similar to last year's Federal Court decision in *Kraft Reinsurance Ireland Ltd. v. Pallets Acquisitions, LLC* (N.D. Ga. 2011) 845 F.Supp.2d 1342 (the "Kraft Moldy Pallet Case"). There, Kraft shipped food products to Panama on pallets manufactured by the defendant. The containers and their contents were contaminated with mold when Panamanian inspectors first opened them. Kraft subsequently sent a letter to defendant stating that Kraft would hold the defendant fully liable for losses resulting from the mold contamination. Kraft later chose to incinerate the contaminated cargo and the pallets.  There was no evidence that Kraft ever notified the defendant that the pallets would be destroyed.

Kraft's cargo insurer filed suit against the pallet manufacturer alleging negligence and breach of warranties.  (Unlike our case, there were no contract specifications regarding moisture content, kiln-drying, or indeed, even whether the pallets were to be made from "green" or "raw" wood.)  Defendant moved for summary judgment, but the court denied the motion finding questions of fact on both warranty claims.[10]  Those questions are virtually identical to those presented here. Similarly, SFP's motion for summary judgment must be denied. Additionally, in the Kraft Moldy Pallet Case, our facts require this Court to remedy SFP's spoliation of evidence. Kraft (the pallet purchaser) destroyed the pallets after it wrote the above-described letter to the seller.  On

---

[10]  845 F.Supp.2d at 1755-56.

- 5 -

that basis, the defendant-seller moved (as an alternative to summary judgment) to dismiss the case based on spoliation of evidence. Although the court denied that motion, finding dismissal too harsh a sanction based on the record presented, the court ordered an evidentiary hearing on the issue of the appropriate sanction.

In our case, SFP chose to give the pallets away when it retrieved them from NBTY. [11] This decision was made well after SFP thought it "looked like there was going to be some sort of legal proceedings in the future."[12] In light of these facts, the remedy is obvious. SFP cannot be heard to argue that NBTY cannot prove the precise moisture content of the pallets – as it does in section B(1)(b), *infra*. when SFP's disposal of the pallets (after it should have been aware of that litigation was likely) prevented NBTY from testing them. Nor can SFP argue that the black, furry substance growing on the pallets was not mold because SFP chose to give the pallets away. Accordingly, NBTY moves the Court for an order precluding SFP from submitting evidence of the alleged moisture content, and from asserting that the black stuff on the pallets was simply a "discoloration."[13]  In the alternative, if this Court denies NBTY's motion, for an evidentiary hearing on the appropriate sanction. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir.2006).[14]

---

[11] Appendix at Exhibit B (Scott Dep. 129; 14-17) ("[the pallets] were removed and given to the companies that packed them up.").

[12] Appendix at Exhibit A (McCarron Dep., 40:16-16).

[13] Here, NBTY does not even have to prove that the substance that grew on the pallets was mold. It is certainly not beyond the province of a pallet salesman with 20 years of experience in the construction industry – Joe McCarron - and a warehouse manager - like Sergio Ruvalcaba - to identify that the black stuff growing on the pallets and displays looked like mold. Whether they are right or not does not matter.

[14] SFP attempts to wriggle out of the predicament it created for itself by giving the pallets away by claiming that this is an 11th hour ploy by NBTY, that NBTY should have tested the pallets, and that the Kraft Moldy Pallet case is distinguishable because NBTY did not retain an expert. These arguments are mere filler. McCarrons's testimony establishes SFP feared litigation in October 2010. In early December, SFP received a letter from NBTY seeking the same damages now sought in this case. Appendix at Exhibit 11. Now is the earliest opportunity for NBTY to raise this issue. As the proponent of undocumented evidence regarding alleged moisture content, SFP was under an obligation to preserve the evidence. It did not do so.

1

**B.      Count One – Breach of Contract.**

2

       1.      <u>Defendant's Position: NBTY's Breach of Contract Claim Fails as a Matter of Law For Several Reasons.</u>

3

4      In this case, NBTY attempted to either reject the pallets or revoke acceptance of

5  the pallets as nonconforming to the contract under U.C.C. §§ 2-602 and 2-608,

6  respectively.[15] The right to reject or revoke acceptance requires proof of breach—*i.e.*,

7  that the goods at issue did not conform to the contract. A plaintiff has the burden of

8  proving the elements of a breach of contract claim.[16] Plaintiff cannot meet this burden in

9  this case for a host of reasons.

10

       *a.      The Terms of the "Contract."*

11      The determination whether a breach of contract occurred first requires ascertaining

12  the relevant terms of the contract. SFP sent a Quotation to NBTY.[17] NBTY then sent five

13  separate Purchase Orders to SFP.[18] SFP sent Invoices to NBTY upon delivery.[19] The

14  subsequent letters complaining about the pallets were written on behalf of NBTY.[20]

15

---

16  Contrary to SFP's unsupported assertions, expert testimony is not required here.  SFP cannot be permitted to benefit from its failure to preserve the key evidence in the case.

17      Similarly, SFP's argument that the condition of the pallets is "irrelevant" strains the

18  bounds of zealous advocacy.   The whole case is about the condition of the pallets.  By way of analogy, if I buy a burger from McDonald's, take a bite and cut my tongue on a razor blade,

19  return it to the counter saying, this burger has a razor blade in it and it cut me.  The manager takes the burger, trashes it, gives me a new one and my money back.  I later sue for my cut lip.

20  McDonald's cannot introduce evidence that the burger contained no blade.  It can introduce circumstantial evidence of its quality control procedures and testimony from employees saying

21  no one put a blade in the burger, but it can't rely on evidence that required the burger to be preserved and/or examined before it was trashed.  Spoliation does not require anything more

22  than negligence. The fact that the spoliation here may be negligent rather than intentional does not excuse Plaintiffs. *Gallagher v. Crystal Bay Casino, LLC*, 2010 WL 4669399 (D. Nev., Nov.

23  8, 2010) (the fact that spoliation is negligent, not intentional is not an excuse).

[15] NYUCC §§ 2-602 and 2-608.

24      [16] *Gordon v. Leonetti*, 324 F.2d 491, 492 (2d Cir. 1963).  The elements, of course, are the existence of a contract, plaintiff's performance, defendant's breach and resulting damages. *J.P.*

25  *Morgan Chase v. J.H Elec. Of New York, Inc.* 69 A.D. 3d 802, 803 (N.Y. Sup. Ct. 2005).

26      [17] Appendix at Exhibit 1 (Southwest Forest Products Quotation dated August 24, 2010).

      [18] Appendix at Exhibit 2 (Purchase Order No. 455166), Exhibit 3 (Purchase Order No.

27  457821), Exhibit 4 (Purchase Order No. 461135), Exhibit 5 (Purchase Order No. 444236),

28

- 7 -

NBTY's breach of contract claim turns on the allegation that SFP delivered "wet" pallets and that the excessive moisture eventually caused mold to grow on the pallets and the product displays.[21] The operative question, therefore, is what did the "contract" say about the moisture content of the pallets?

The answer to this question ultimately depends on the documents that comprise the contract. NBTY has alleged that the contract consists of (1) the Purchase Orders and (2) the NBTY Vendor Compliance Guide. NBTY Acquisition sent a copy of the Vendor Compliance Guide to SFP prior to purchasing the pallets.[22] Neither the Purchase Orders nor the Vendor Compliance Guide, however, specified any moisture content requirement for the pallets. Although SFP's Pallet Design System ("PDS") specifications state that the pallet's moisture content would be 19% or less,[23] NBTY has not alleged that the PDS specifications were a part of the contract. If the PDS specifications were not part of the contract, which appears to be NBTY's position, then the contract contained no maximum moisture content whatsoever. If the PDS specifications were part of the contract, on the other hand, the maximum moisture content of the pallets under the contract would be 19%. Likewise, the maximum moisture content of the pallets would be 19% if industry standard moisture contents were read into the contract.

NBTY has taken the position that the "Costco specifications" were also part of the contract because the Purchase Orders state that the pallets must "meet[] January 2011

Exhibit 6 (Purchase Order No. 452765). All purchase orders contain a New York choice of law provision.

[19] Appendix at Exhibit 7 (SFP Invoice No. 0407824-IN); Exhibit 8 (SFP Invoice No. 0408052-IN); Exhibit 9 (SFP Invoice No. 0408178-IN); Exhibit 10 (SFP Invoice No. 0408289-IN).

[20] Appendix at Exhibit 11 (letter from C. McInerney to S. Van Der Toorn dated December 3, 2010); Exhibit 12 (letter from C. McInerney to S. Van Der Toorn dated January 3, 2011).

[21] Complaint, ¶¶ 19 and 20.

[22] Appendix at Exhibit 13 (Vendor Compliance Guidelines).

[23] Appendix at Exhibit 14 (Pallet Design System Specifications), p. 3 ("Moisture content (at manufacture and assembly): Air Dry – 19%").

Costco Pallet Specs."[24] Multiple versions of the so-called "Costco specifications," however, exist.[25] Two separate documents have been identified as the relevant "Costco Pallet Specs." The "Costco Pallet Specs" produced by NBTY in this litigation contain only two pages and were revised effective July 30, 2010.[26] By contrast, the second version of the Costco Pallet Specs, which SFP printed and produced after the commencement of this lawsuit include a two-page "Addendum to the Structural Packaging Specifications for "Non-Rental General Delivery - North America" with a revision date of August 1, 2010.[27]

NBTY testified that their two-page version of the Costco specifications (Exhibit 15), excluding the Addendum, was "the only copy that [NBTY] ever saw,"[28] and the employee who ordered pallets from SFP testified he was looking at this version of the Costco specifications when he requested a quotation from SFP. As NBTY has never produced a copy of the Addendum, it is clear that it did not possess a copy of the document at any time before this litigation (and certainly not at contract formation). Although NBTY believed that the new Costco specifications included "specifications regarding moisture levels," they could not identify any Costco specifications setting moisture content.[29] Notably, NBTY never sent any version of the Costco specifications to SFP before placing orders for pallets and was unaware of the Addendum.[30]

---

[24] Appendix at Exhibits 2-5.

[25] Appendix at Exhibit 14, p. 3.

[26] Appendix at Exhibit 15 (Costco Structural Packaging Specifications dated July 30, 2010).

[27] Appendix at Exhibit 16 (Costco Structural Packaging Specifications dated August 1, 2010).

[28] Appendix at Exhibit D (David Quinton Dep.), p.114:l.3-10.

[29] Appendix at Exhibit D, p.15:l.26 – p.16:l.17.

[30] Appendix at Exhibit D, p.114:l.3-10 (the "two page" specifications" was "the Costco spec that I was referring to when I requested a quotation from Joe"), p.115:ll.9-24 ("this was the only copy that I ever saw"); p.116:ll.1-5.

A threshold question exists as to whether a meeting of the minds even existed with respect to the Addendum's terms—namely, the requirement that the pallets be kiln-dried. In essence, NBTY is arguing that a form that it never saw before filing suit, and never communicated to SFP, should nevertheless be part of the contract. However, the plaintiff carries both "the burden of proving that a contract was indeed made and the burden of proving the terms of the contract."[31] Here, NBTY asserts that SFP breached the contract by failing to abide by a specific term (kiln-drying) that NBTY was not aware of, did not communicate to SFP, and did not raise as a basis for breach until long after the commencement of this lawsuit. This is a textbook example of a lack of the meeting of the minds between the parties regarding the inclusion of the Addendum.[32] The failure to prove meeting of the minds falls on NBTY and means that the Addendum was not part of the contract.

Thus, NBTY cannot show that a meeting of the minds existed with respect to the Addendum's kiln-dried requirement "sufficient to give rise to a binding and enforceable contract."[33] In the absence of a meeting of the minds, no agreement existed between the parties for kiln-dried pallets and this unknown term could not have been a part of the contract.[34]

---

[31] *Premier Mountings, Inc. v. Clyde Duneler, Inc.*, 51 UCC Rep. Serv. 2d 1033 (2003); *Vigorito v. Allard*, 118 A.2d 906, 907 (Conn. 1955) ("Where the exact terms of a contract sued upon are put in issue by a denial, the burden is upon the plaintiff to prove what those terms are").

[32] *Barry Mallin & Associates, P.C. v. Nash Metalware Co. Inc.*, 18 Misc.3d 890, 893, 849 N.Y.S.2d 752, 755 (2008) (no meeting of minds on oral contract).

[33] *Missigman v. USI Northeast, Inc.*, 131 F. Supp.2d 495, 518 (S.D.N.Y. 2001) ("court must look at the basic elements of the offer and acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract"); *Silber v. New York Life Insurance Company*, 938 N.Y.S.2d 46, 50 (2012).

[34] Although NBTY argues that the Costco specifications containing the Addendum were part of the contract, placing considerable emphasis on selected excerpts of the deposition testimony of Scott Van Der Toorn, Mr. Van Der Toorn did not testify that he saw this particular version at the time of contract formation and actually believed he probably provided a copy of the document "[p]ossibly to educate our counselor on the Costco spec":

>    Q.    Okay. Did the company use this at all as a sales tool in connection with the NBTY transaction?

1    This is not the typical U.C.C. § 2-207 "battle of the forms" issue. Typically, the

2    battle of the forms arises when one party's standard forms (*e.g.*, invoices) include terms

3    that add to or alter the other party's forms (*e.g.*, purchase orders).[35] In a battle of forms,

4    such additional terms generally become part of the contract unless, for example, "they

5    materially alter it."[36] Here, the additional terms were not included in either the purchase

6    order or the invoices. They were unknown to all parties until after NBTY filed this

7    lawsuit. Thus, the present battle of the forms involves one party trying to add new terms

8    retroactively, of which it was not aware at the time it entered into the contract. As such,

9    this is not so much a battle of the forms issue, but rather a contract formation issue.

10    Even if U.C.C. § 2-207 governs the question regarding the inclusion or exclusion

11    of the Addendum as a contract term, however, it is clear that kiln-dried is a term that

12    materially alters the contract. SFP testified that it uses its kiln *only* for heat treatment and,

13    according to the Quotation provided to NBTY, it generally charges more for heat

14    _____

15    A.    No.

     Q.    Did the company use this specification – did the company provide this
16          specification to NBTY?

17    A.    Not to my knowledge.

     Q.    Did NBTY provide this specification to Southwest Forest Products?

18    A.    Not to my knowledge.

19    Q.    What does this have to do with anything then?

     A.    I'm not aware.

20    Q.    Why did you give it to your lawyer in connection with this case then?

21    A.    I don't see where it was requested. Probably to educate our counselor on
           the Costco spec. It's the best assumption I can think of.

22    Appendix at Exhibit B (Scott Dep.) p.101:l.9 - p.102:l.25. In light of the fact that there were
     competing versions of the Costco specifications, Mr. Van Der Toorn's testimony does not
23    establish that the version containing the Addendum was the one that NBTY was referring to
     when it sought to incorporate the "Costco specs" into the contract in its purchase orders. To the
24    contrary, Mr. Quinton's testimony on this point is clear that the "two page" Costco specs was
     the one "that I was referring to when I requested a quotation from Joe." Appendix at Exhibit D,
25    (Quinton Dep.) p.114:ll.3-10.

26    [35] N.Y. U.C.C. § 2-207.

27    [36] *Id.*

28

- 11 -

treatment according to its Quotation and does not have a "kiln dry option."[37] Thus, the kiln-dried requirement clearly materially altered the contract, as it was an option that SFP did not offer.

NBTY did not cite the fact that the pallets were not kiln-dried prior to the commencement of this action and never even alleged it in its Complaint. Rather, it raised this issue only after SFP's counsel produced a version of the Costco specifications containing the Addendum. The Court should reject NBTY's attempt to salvage its breach of contract claim in this manner. Although SFP contends that it is entitled to summary judgment for the foregoing reasons, at a minimum this issue precludes summary judgment for NBTY. NBTY obviously should not be entitled to summary judgment based on an alleged defect that it did not raise prior to this lawsuit or in its complaint.

> b.  *The Contract Did Not Contain a Moisture Content Requirement, But If It Did NBTY Has Not Shown that the Delivered Pallets Failed to Conform to the Contract.*

As discussed above, the Purchase Orders and Vendor Compliance Guide did not specify a moisture content requirement for the pallets. Regardless of which version of the Costco specifications was applicable, neither imposed a moisture content requirement for the pallets. In fact, the only document that imposed any moisture content requirement was the PDS specifications, which stated that the pallets' moisture content would be 19% or less.

If the PDS specifications were part of the contract, then the maximum moisture content was 19%. Steve Van Der Toorn, President of SFP, testified that 19% moisture content was the industry standard for "dry" pallets.[38] NBTY has no evidence that the pallets' moisture content was greater than 19%. It admits that it never tested for moisture

---

[37] Appendix at Exhibit 1; Exhibit C (Steve Dep.) p.33:l.24 – p.34:l.5; Exhibit A, p.115:ll.17-22 ("the cost for kiln dry lumber is more than the cost of green lumber"), p. 116:ll.14-15 ("They don't have a kiln dry option") & p.116:ll.17-23.

[38] Appendix at Exhibit C (Steve Dep.) p.15:ll.14-16.

1 content or mold and was unaware of the content at the time of delivery.[39] It further
2 testified that it inspected the pallets upon delivery and did not reject any for being too
3 "wet," or for any other reason for that matter.[40] In fact, NBTY did not have "any
4 understanding of what the moisture content of these pallets were" and has no information
5 or facts to dispute that the moisture content was 19 percent or less.[41] As it would be pure
6 conjecture to say that the pallets' moisture content was greater than 19% in light of
7 NBTY's failure to test the pallets, NBTY has no competent, admissible evidence to
8 support such an assertion.[42]

9        So what evidence exists that the moisture content of the pallets was greater than
10 19%? None. The only evidence of record shows that SFP tested the pallets for moisture
11 content before delivery to ensure they were 19% or less consistent with the PDS
12 specifications. In fact, SFP tested to confirm they were under 17%.[43] Although NBTY
13 may scoff at Mr. Van Der Toorn's testimony or try to dismiss it, Plaintiff has offered no
14 controverting evidence in any form to contradict that testimony.

15

16        [39] Appendix at Exhibit D (Quinton Dep.) p.75:ll.11-17, p.34:ll.4-15, p.69:ll.11-20,
   p.77:ll.9-12, p.85:ll.4-9, 21-25, p.85:ll.1-2; Exhibit E (Ruvalcaba Dep.) p.26:ll.3-5 & 12-14 &
17 24-25 ("We did not test for moisture"), p.31:ll.1-14, p.32:ll.1-7 (admitting NBTY has does not
   have "any understanding of what the moisture content of these pallets were"); Exhibit 20 (email
18 from D. Quinton to V. Avina and F. Ash).

19        [40] Appendix at Exhibit E (Ruvalcaba Dep.) p. 10:l.2 – p.11:l.23.

20        [41] Appendix at Exhibit E (Ruvalcaba Dep.) p.32:ll.1-7. In fact, NBTY did not even know
   how to test pallets for moisture content. *See* Appendix at Exhibit E (Ruvalcaba Dep.) p.31:ll.18-
   19.

21        [42] *Nelson v. Pima County Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996)
22 ("mere allegation and speculation do not create a factual dispute for purposes of summary
   judgment"); *Harlan Associations v. Incorporated Village of Mineola*, 273 F.3d 494 (2d Cir.
   2001) ("mere speculation and conjecture is insufficient to preclude the granting of the motion");
23 *Leggio v. Gearhart*, 294 A.D. 543, 743 N.Y.S.2d 135 (2002) ("mere conjecture, suspicion, or
   speculation" is insufficient to defeat summary judgment: "Speculation, grounded in theory
24 rather than fact, is insufficient to defeat a motion for summary judgment").

25        [43] Appendix at Exhibit C (Steve Dep.) p.15:l.1 – p.16:l.21, p.17:ll.3-17, p.27:ll.12-13 ("I
   personally made sure those pallets were 16 percent, not 19"), p.29:ll.6-23 ("the whole pod stays
26 segregated until such a time that I'm comfortable that every pallet was at 16 percent moisture");
   p.50:ll.17-19 ("I wouldn't let the suckers out the gate unless they were 16 percent, three points
27 below what's required").

28

Of course, NBTY cannot carry its burden of proving that SFP breached the contract by failing to deliver pallets having moisture content of 19% or less, to the extent such a requirement even existed, by ridicule or mere disbelief. Unable to controvert this evidence and without any evidence of its own regarding the actual moisture content of the pallets at the time of delivery or the alleged existence of mold, NBTY contends the Court should come to its rescue by sanctioning SFP for alleged spoliation of evidence because the pallets were returned to SFP and are no longer available for moisture testing. NBTY seems to overlook the fact that the pallets are made of wood and any moisture test would only ascertain the amount of moisture content present at the time of the testing. Even if the wood pallets had been stored or retained, therefore, any moisture test performed years, months, or just weeks after delivery would be of absolutely no probative value as to the moisture content of the pallets back in 2010 at the time of delivery. This is especially true since NBTY stockpiled the pallets outdoors from October 2010 until they were picked up in January 2011.[44] Any moisture or mold testing performed after the commencement of this lawsuit would not have any bearing as to what the moisture content was at the only relevant time—*i.e.*, delivery. After the pallets were delivered and out of SFP's control, we have no way of knowing the conditions to which the pallets were exposed during Southern California's rainy season that could have affected moisture content. Once the pallets were placed outdoors for months without any controls on the environment, it became impossible to test them for moisture content at the time of delivery or mold.

NBTY cannot prevail on its spoliation claim because it cannot show that the destroyed evidence was relevant to any claim or defense or that SFP "destroyed" them with a "culpable state of mind."[45] Another factor that militates against a finding of

---

[44] Appendix at Exhibit D (Quinton Dep.) p.69:l.21 – p.70:l.6 ("They were moved outside the building…[i]nto the parking lot…onto the side of the building…[o]n the ground").

[45] *In re Hitachi Television Optical Block Cases*, 2011 WL 3563781 (S.D. Cal. 2011); *Suroweic v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) ("A party

spoliation is that the evidence is undisputed that SFP used the pallets according to its standard practices.[46] Thus, the notion that SFP should be sanctioned for failing to preserve the pallets for irrelevant moisture testing done months, or even years, after the fact in the event of an eventual lawsuit borders on the ludicrous as it is NBTY, if anyone, that has failed to preserve evidence by failing to conduct any tests. It is NBTY that failed to preserve the pallets in the condition they were in at the time of delivery and subsequently destroyed the product displays. NBTY had the pallets in its possession for several months. Despite apparently knowing that they were going to file a lawsuit claiming that the pallets' moisture content did not conform to the terms of the contract, NBTY took no steps to test the pallets to support its future claims on which it would have the burden of proof or demand that SFP preserve the pallets. NBTY then stored the pallets outdoors, effectively eliminating any chance of conducting a moisture test that would be able to determine moisture content for the relevant period of time. What happened to the pallets after they were stored outside has no bearing to any issue in this case.

The logic of NBTY's spoliation argument is elusive. NBTY discovers what it contends is "mold" on the pallets and claims they are wet. NBTY then moves all of them outdoors where they sit, unprotected, for several months, eliminating any chance of determining what the moisture content was upon delivery. NBTY demands that SFP pick up the pallets. More than one year later, after SFP has gotten rid of them in the ordinary course of its business, NBTY sues SFP. NBTY claims that SFP should have predicated this lawsuit and held onto the pallets for possible moisture testing years later.

---

seeking sanctions for spoliation of evidence must prove…the evidence that was destroyed was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence.").

[46] *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009) (destruction of documents in ordinary course of business is not spoliation).

While it is perhaps a time-honored strategy to blame one's evidentiary shortcomings on the opposing party, SFP at no time prevented NBTY from conducting any tests, either as to the moisture content or mold. NBTY chose not to undertake any tests to support its claims and only now, when faced with the obvious consequences of its deliberate choices, suggests SFP should be to blame for its lack of proof. The lack of evidentiary support, however, falls solely on NBTY's shoulders. Absent any evidence that the pallets exceeded this moisture content, Plaintiff has not shown, and cannot show, that the pallets failed to conform to the contract on the basis that they were "wet" or contained "excessive moisture" as a matter of law.

                                                  *c.*    *The Kiln-Dried Requirement, If It Was Even a Contract Term, Is A Red Herring and Cannot Support a Claim for Breach of Contract.*

Perhaps in light of its lack of evidence establishing the actual moisture content of the pallets at the time of delivery NBTY attempts to shift its theory of the case from the delivery of "wet" pallets to the delivery of pallets that were not kiln-dried. As discussed above, NBTY has not shown that kiln-drying was even a term of the contract or that any meeting of the minds existed with respect to the Addendum's kiln-dried requirement. This is fatal to NBTY's revised theory of its case.

Although NBTY contends that the "Costco specifications" required kiln-dried pallets, NBTY's version of the "Costco specifications" did not require kiln-dried pallets; it required "heat treatment" only for international shipments.[47] Notably, SFP's pallets were intended for "fence front" product displays at various Costco stores within the United States only.[48] Thus, the heat-treatment requirements in the Costco specifications are ultimately irrelevant.

---

[47] Appendix at Exhibit 15, p. 2.

[48] Appendix at Exhibit D (Quinton Dep.) p. 32:ll.14-25, p.33:ll.1-3, p.121:ll.10-16.

1    By contrast, the kiln-dried requirement appears only in the Addendum of which
2  NBTY was completely unaware at the time of contract formation. NBTY never sent any
3  Costco specifications, let alone the Addendum, to SFP before delivery and testified that
4  the two-page version of the Costco specifications, without the Addendum, was the only
5  version of which they were aware.[49] They were unaware whether they ever requested that
6  the wood be kiln-dried at the time of delivery.[50] Because NBTY has not established that
7  the Addendum was even part of the "Costco specifications" and admits it was unaware of
8  it at the time of contract formation, it clearly was not a material term of the contract and
9  cannot serve as a basis for SFP's alleged breach.[51] This is especially true since NBTY
10 knew from the PDS specifications that they requested, as well as the cost of the pallets as
11 reflected in the original proposal, that SFP was delivering air-dried pallets.[52] Having
12 accepted air-dried pallets and failing to convey any other requirement to SFP, NBTY
13 could not reject acceptance of the pallets for not being air-dried.[53]

14    Furthermore, NBTY cannot establish breach based on new terms or facts learned
15 in hindsight. Section 2-605 of the New York's Uniform Commercial Code, in particular,
16 prohibits a buyer from establishing breach based on particular defects not previously

---

18   [49] Appendix at Exhibit D (Quinton Dep.) p.67: ll.2-13 ("I received that [copy of a
document that Costco provided to their customers laying out the new specifications] from our
19 distribution group. I did not relay specifications to Joe McCarron"), 114, p.3-10 (the "two page
long…Costco specifications…is the Costco spec that I was referring to when I requested a
20 quotation from Joe"), p.115:ll.18-19 ("this was the only copy that I ever saw"). The absence of
the Addendum from NBTY's document production further confirms that NBTY did not have a
21 copy of the Addendum at the time of contract formation and, in fact, did not have it at the time it
commenced this litigation.

22   [50] Appendix at Exhibit D (Quinton Dep.) p. 110, ll.19-21.

23   [51] N.Y. U.C.C. LAW § 2-313.

24   [52] *See* Appendix at Exhibit 1; Exhibit 15, p. 3 ("Moisture content (at manufacture and
assembly): Air Dry – 19%").

25   [53] N.Y. U.C.C. LAW § 2-602(1) ("Rejection of goods must be within a reasonable time
after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.");
26 *id. at* comment 3 ("If the seller has made a tender which in all respects conforms to the contract,
the buyer has a positive duty to accept and his failure to do so constitutes a 'wrongful rejection'
27 which gives the seller immediate remedies for breach.").

28

communicated to the buyer.[54] The letters sent rejecting the pallets do not complain that the pallets were not kiln-dried.[55] As NBTY did not raise the fact that the pallets were not kiln-dried until after commencement of this litigation, they are barred from arguing breach based on the fact that the pallets were not kiln-dried.

Finally, the kiln-dried requirement, to the extent it existed, is a red herring. Scott Van Der Toorn, who is the Executive Vice President of Southwest Forest Products and oversees "most facets of the production" of pallets, including but not limited to "logging, saw mill, new pallet assembly, used and repair and transportation." Kiln-dried, like air-dried, merely refers to the method for reducing moisture content in prefabricated wood most commonly used in the Northwest and similar regions where the air-drying process would take longer and possibly never reach the desired moisture content due to ambient elements and does not specify or ensure a particular moisture content.[56] Wood used to construct pallets can be dried by either method to reach the desired moisture content.[57] However, wood can only be kiln-dried before the pallets are constructed.[58]

NBTY's breach of contract argument can be summarized succinctly as follows: The contract required kiln-dried pallets. Because the pallets were not kiln-dried, they must have been "wet." The fallacy in this argument, of course, is that kiln-drying does not necessarily mean that pallets are a particular moisture content. In other words, "kiln-dried" is neither synonymous with "dry" nor the opposite of "air-dried." Both are methods for drying pallets to, say, 16%, 19%, 25%, or even greater. In essence, NBTY confuses the *method* for drying with the idea that "kiln-dried" means "no moisture." In

---

[54] N.Y. U.C.C. LAW § 2-605(1) ("The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him from relying on the unstated defect to justify rejection or to establish breach…").

[55] *See* Appendix at 11 and 12.

[56] *See* Appendix at Exhibit B, p. 39:l.25 – p.40:l.6; p.58:ll.14-22, p.59:;ll.1-4. Exhibit 27 (Affidavit of Scott Van De Toorn), ¶¶ 2-3, 6-8.

[57] *See* Appendix at Exhibit 27, ¶¶ 2-3.

[58] *See* Appendix at Exhibit 27, ¶ 5.

other words, the moisture content of the pallets would have been the same regardless whether they were air dried or kiln-dried. And, of course, NBTY has presented no evidence that the pallets were anything greater than 19%.

For the foregoing reasons, the failure to deliver "kiln-dried" pallets cannot support a claim for breach of contract as it was never part of the contract, but even if it was, Plaintiffs have offered no evidence that the failure to kiln-dry the pallets resulted in "wet" pallets. Nor has Plaintiff shown that the failure to kiln-dry the pallets caused the alleged discoloration. Given the similarities between the drying methods, the mere failure to kiln-dry, if a term of the contract, did not amount to a breach. Thus, even under the "perfect tender rule," there is no materiality to the wood being kiln-dried (to the extent it was even part of the contract); the operative term is "dry" (*i.e.*, under 19%). Regardless whether framed in terms of "wet" pallets or pallets that were not "kiln-dried," Plaintiffs cannot show a breach that would justify either rejection or revocation of acceptance under the Uniform Commercial Code.

> d.   *The Alleged "Discoloration" Was Not a Breach.*

Nor does the mere existence of alleged discoloration justify rejection or revocation of acceptance. At the time of delivery, the pallets looked "clean" and the only issue observed with the pallets was that there were some "hairy" pieces of wood on the pallets.[59] However, NBTY accepted the pallets notwithstanding the fact that they were "hairy."[60]

Sometime over the next three weeks, NBTY began placing product displays on the pallets and wrapping them in plastic wrap in the rented warehouse.[61] The product displays were already in the warehouse, sitting on pallets purchased from another

---

[59] Appendix at Exhibit E (Ruvalcaba Dep.), p. 10:ll.2-12.

[60] Appendix at Exhibit E (Ruvalcaba Dep.), p.11:ll.21-23.

[61] Appendix at Exhibit E (Ruvalcaba Dep.), p.17:ll:3-14, p. 18: 9-13, p. 24: ll.4-15.

- 19 -

vendor.[62] Plaintiffs contend that on or about October 22, 2010, after wrapping an unspecified number of pallets, it observed what appeared to be moisture under the shrink-wrap and a discoloration on the pallets that it described as "mold."[63]

Notably, NBTY never conducted any tests, never had any analysis performed of the discoloration, and has not retained any expert in this case to testify as to the cause of the discoloration or the link between the discolored pallets and the problems discovered with the cardboard product displays that NBTY Acquisition claims was damaged.[64] Federal law, which governs the admissibility of evidence in this case, is clear that expert testimony is necessary to establish both that the discoloration observed was mold and that the alleged moisture content in the pallets was sufficient to allow mold to grow.

> To establish such an element of complex causation, however, Plaintiff must provide evidence beyond lay opinions. In a case involving complex issues of causation not readily apparent to the fact finder, plaintiff must present admissible expert testimony to carry [its] burden.[65]

Nor has NBTY offered any evidence that the source of the discoloration was a problem inherent in the pallets as opposed to something in the warehouse or the product displays. The failure of Plaintiffs to provide such evidence is fatal to their breach of contract claim.

Finally, NBTY testified that it was unaware that Costco ever rejected pallets for discoloration and only recalled Costco rejecting pallets that were damaged in transit or by carrier.[66] NBTY has offered no competent or admissible evidence that the alleged

---

[62] Appendix at Exhibit E (Ruvalcaba Dep.), p.13:ll.8-25, p.14:ll.1-15.

[63] Appendix at Exhibit E (Ruvalcaba Dep.), p.28:ll.4-19, p.29:ll.5-9, p.25:ll.11-21, p.26:ll.3-5, p. 27:ll.8-21.

[64] Appendix at Exhibit D (Quinton Dep.), p.75:ll.11-17, p.34:ll.4-15, p.69:ll.11-20, p.77:ll.9-12, p.85:ll. 4-9, 21-25, p.85:ll.1-2; Exhibit E (Revulcaba Dep.) , p.26:ll.3-5 & 12-14 & 24-25, p.31:ll.1-14, p.32:ll.1-7.

[65] *Kemmerer v. State Farm Ins. Co.*, 2004 WL 87017 (E.D. Pa. 2004); *Cary v. Automobile Ins. Co. of Hartford, Connecticut*, 838 F. Supp. 2d 1117 (D. Colo. 2011) ("How one tests for the presence of mold in a home…are subjects that are beyond the typical knowledge and experience of a lay juror").

[66] Appendix at Exhibit E (Ruvalcaba Dep.), p.47:ll.10-25.

- 20 -

discoloration observed on the pallets was mold or that the pallets were the source of this so-called "mold" (as opposed to, for example, Plaintiffs' storage of the pallets in an un-air conditioned warehouse for several weeks, exposure to elements while in Plaintiffs' custody, or some defect in the cardboard displays).

Plaintiffs seek to establish these necessary facts by lay witness testimony only and chose not to retain any experts. However, all of the foregoing facts require expert testimony.[67] A lay witness cannot establish the existence of mold and certainly cannot provide the necessary causal link establishing that the pallets were the source of the mold.[68] Because Plaintiffs do not have any expert testimony to establish the foregoing facts, and cannot use lay witness testimony, they cannot claim breach of contract based on the allegation that they believe something that looked like "mold" eventually grew on the pallets due to some condition with the pallets and then spread to the cardboard displays.

The admissible evidence, at best, demonstrates only that most of the wrapped pallets became discolored after sitting in the warehouse for several weeks and that this discoloration was also visible on the cardboard displays placed on the pallets. The mere appearance of discoloration, without more, is insufficient as a matter of law to establish a breach on the part of SFP. Other than pictures of discolored pallets and anecdotal evidence by unqualified observers that the discoloration and damage to the product displays resembles mold, NBTY Acquisition has no evidence that the discoloration was caused by any defect in the pallet (as opposed to a defect in the warehouse—*i.e.*, lack of

---

[67] *Noetzli v. Naghi*, 2011 WL 1087239 (Cal. Ct. App. Mar. 25, 2011).

[68] *Kurtz v. Chicorp Financial Services*, 286 A.D.2d 753, 731 N.Y.S.2d 187 (2nd Dept. 2001) ("defendants failed to present any expert testimony to support their argument that the building modification was the proximate cause of the mold growth and plaintiffs' injuries"); *Qualls v. State Farm Lloyds*, 226 F.R.D. 551 (N.D. Tex. 2005) (granting summary judgment based on lack of expert testimony necessary to establish mold causation: "while the general causal relationship between water and mold may be common knowledge, the specific cause issue here is not within the general experience and common sense of a lay person"); *Ingram v. Guideone Mut. Ins. Co.*, 2007 WL 4165361 (S.D. Miss. 2007) (hearsay evidence insufficient to establish existence of mold and expert testimony was required).

- 21 -

air conditioning—and/or misconduct of NBTY Acquisition employees or third parties). Such pictures and anecdotes are insufficient as a matter of law to establish that SFP breached its contract. NBTY Acquisition has also failed to demonstrate what contract provision, if any, discolored pallets breached.

Such speculation and conjecture is insufficient to support a claim for breach of contract.[69]

### e.    No Basis Existed for NBTY to Reject or Revoke Acceptance.

The Uniform Commercial Code's perfect tender rule permits a buyer to reject nonconforming goods.[70] Where the buyer has already accepted the goods, the buyer may have the right to revoke acceptance if he discovers the alleged non-conformity after acceptance. As discussed above, however, the goods did conform to the contract and there is no competent evidence to the contrary. Mere allegations of wet pallets and hidden mold, without any corroborating evidence, did not justify rejection or revocation of acceptance, as they do not demonstrate by competent evidence any failure to conform to the contract. The fact that the pallets were not kiln-dried, likewise, does not support rejection or revocation of acceptance because there is no evidence that kiln-dried was a requirement of the contract. NBTY's breach of contract claim fails for want of evidence.

### f.    Joe McCarron's Testimony Does Not Support a Claim for Breach.

In an attempt to create a question of fact, NBTY relies heavily on the testimony of Joe McCarron. Mr. McCarron was a salesman for SFP located in Southern California for approximately thirteen months.[71] He worked out of his house and did not have an office at SFP's Phoenix headquarters.[72] He asked for the title vice president of sales "because if I were to open up the territory for a company out of Phoenix area, I felt I needed a title in

---

[69] *Nelson*, 83 F.3d at 1081-82 (9th Cir. 1996); *Harlan Associates*, 273 F.3d 494 (2d Cir. 2001) ("mere speculation and conjecture is insufficient to preclude the granting of the motion").

[70] *See* NYUCC § 2-602.

- 22 -

order to get in with purchasing managers of large corporations."[73] This was Mr. McCarron's only experience in the lumber or pallet manufacturing industry.[74]

He was strictly a salesman in Southern California and his knowledge of SFP's business operations was limited in this regard. He admitted he had no firsthand knowledge regarding operations in Arizona, logging, production, or transportation except for "a tour of the forest where they harvested the timber," "a tour of their facility where they cut and manufactured the pallets," and "several days of training.[75] He had no involvement in "the cutting of lumber…the manufacture of pallets… [or] the quality control aspect."[76] He was unaware of any of the company's procedures for testing moisture content of pallets, received no training as far as testing for moisture content in pallets, and did not test the delivered pallets.[77] He also never tested for mold and did not know how to test for mold.[78]

Yet, Mr. McCarron had no problem offering his unsubstantiated opinions and speculation regarding the type of trees used to create the pallets, when they were cut, and how they were transported to California. Although he admitted he did not know "the timetable from the time that the actual trees were harvested until the time the pallets were made for this specific order,"[79] he nevertheless speculated regarding when trees were often cut "within a week of harvesting the trees."[80] He also had no problem opining that the vehicle hauling the pallets was stopped at the scales and that some pallets had to be

---

[71] Appendix at Exhibit A (McCarron Dep.), p.8:l.23 – p.9:l.4 & p.9:ll.19-21.

[72] Appendix at Exhibit A (McCarron Dep.), p.16:ll.4-16.

[73] Appendix at Exhibit A (McCarron Dep.), p.17:ll.18-23.

[74] Appendix at Exhibit A (McCarron Dep.), p.33:ll.13-18.

[75] Appendix at Exhibit A (McCarron Dep.), p.34:ll.4-11, p.101:ll.4-21.

[76] Appendix at Exhibit A (McCarron Dep.), p.101:ll.6-21.

[77] Appendix at Exhibit A (McCarron Dep.), p.27:ll.8-14, p.102:ll.4-17, p.109:ll.8-14.

[78] Appendix at Exhibit A (McCarron Dep.), p.103:ll.4-21.

[79] Appendix at Exhibit A (McCarron Dep.), p.32:ll.18-25, p.33:ll.1-3.

[80] Appendix at Exhibit A (McCarron Dep.), p.33:ll.4-11.

1  unloaded because they had been shipped wet even though he admitted he was not
2  "present in Phoenix when the pallets were built…[or] loaded into the vehicle that they
3  were transported to California in," was not "present at any point along the way other than
4  the final destination."[81] These are not facts that he knows firsthand—either someone told
5  him or, more accurately, he is offering pure conjecture. However, he readily admitted in
6  his deposition that he possessed no firsthand or actual knowledge regarding any of these
7  events. Nor does any documentary evidence exist to support Mr. McCarron's narrative of
8  the events that he imagines occurred.

9        Mr. McCarron's account of the logging of the lumber, manufacture, and
10  transportation of the pallets is admittedly speculation and he lacks any firsthand
11  knowledge. Mr. McCarron's unabashed speculation, hypotheses, and hollow opinions are
12  insufficient to overcome summary judgment because it is not admissible evidence.[82] All
13  of the testimony of Mr. McCarron relied upon by NBTY should be stricken or, at a
14  minimum, disregarded by the trial court.

15        Finally, NBTY urges the Court to give Mr. McCarron's testimony greater weight,
16  suggesting that he is more credible than others. Of course, these are not appropriate
17  determinations to be made on a motion for summary judgment. A trier of fact listening to
18  Mr. McCarron could just as easily conclude that he is a disgruntled former employee who
19  is trying to embellish on his knowledge just like he embellished on his job title while at
20  SFP. As NBTY's motion is based almost entirely on Mr. McCarron's testimony, NBTY
21  is clearly not entitled to summary judgment. However, Mr. McCarron's testimony does

22  ─────────────────
       [81] Appendix at Exhibit A (McCarron Dep.), p.104:ll.2-18.

23     [82] *SNCB Corporate Finance Ltd., v. Schuster*, 877 F. Supp. 820 (S.D.N.Y. 1994)
24  ("unsupported assertion by someone lacking firsthand knowledge…is insufficient to defeat a
    motion for summary judgment"); *Lumoa v. Potter*, 351 F. Supp. 2d 426, 432 (M.D. N.C. 2004)
25  (evidence showing that witness "could not have firsthand knowledge" "do not meet the personal
    knowledge requirement of Rule 56(e)"); *Palomo v. Trustees of Columbia University in City of*
26  *New York*, 170 Fed. Appx. 194, 197 (2nd Cir. 2006) (account that fails to describe firsthand
    knowledge of testimony "amounts to mere speculation, which cannot defeat the…motion for
27  summary judgment").

28

not create a question of fact with respect to the issues raised in SFP's motion as his testimony is irrelevant to the issues raised above.

        2.    <u>NBTY's Position: NBTY is entitled to Judgment in its Favor on the Breach of Contract Claim and SFP's Motion Must Be Denied</u>

        *a.*    *The Undisputed Facts show that SFP Breached Its Contract to Provide pallets built with Kiln-Dried wood to NBTY.*

SFP acknowledges above that the contract at issue here includes the Vendor Compliance Guide and Purchase Orders.  The real question is:  What additional terms were included?  On this point, SFP's testimony is clear.

Q    Isn't it correct that this, Exhibit 16, are [sic] the specifications from Costco regarding the requirements for pallets that suppliers are delivering to Costco.

A    Yes.

Q    But it's correct that your company knew at the time of placement of the purchase order by NBTY that the pallets that your company was making for NBTY were going to be delivered to NBTY to Costco, correct?

A    Yes.

Q    And then your - - and so your company knew at that time, the time the order was placed by NBTY, that the pallets would be required to comply with structural packaging specifications published by Costco, correct?

A    Yes.

Q    You would agree with me that the contract between my client, NBTY, and your company, required that the pallets that your company delivered to NBTY comply with Exhibit 16, correct?

[Form Objection by SFP's counsel]

- 25 -

1          A     Yes.[83]

2          SFP attempts to avoid the devastating impact of Scott's admission on its case by

3 raising several meritless arguments  In the text and accompanying footnotes in section

4 B(1)(a), SFP urges that a factual dispute exists because an earlier version of the Costco

5 Specifications exists which NBTY's representative – David Quinton - testified he was

6 looking at when he placed the order for pallets with Joe McCarron.  So what?  As Mr.

7 Quinton also testified, "I asked him [McCarron] if he needed it [revised specifications]

8 and he said he had access to it."  Appendix at Exhibit D (David Quinton Dep., p. 115:23-

9 24)  What Mr. Quinton saw or sent is irrelevant in the face Scott's unequivocal

10 cknowledgment that the company was required to comply with Exhibit 16 in

11 manufacturing the pallets for delivery to NBTY.[84]

12          No meeting of the minds?  Really?  SFP cannot produce a single case that supports

13 its assertion that – despite SFP's clear admission that Exhibit 16 was part of the contract

14 – the fact that the document was not in NBTY's possession at the time of the litigation

15 somehow vitiates SFP's agreement to the terms thereof.  The "meeting of the minds"

16 argument addresses situations where the party alleged to have breached the contract

17 claims not to have agreed to it.  Here, SFP acknowledged it agreed to the kiln-dried term.

18          That NBTY is entitled to summary judgment on the breach of contract claim could

19 hardly be simpler or clearer. The Costco Structural Packaging Specifications (Exhibit 16)

20 were produced by SFP[85]and SFP admitted that it was required to comply with these exact

21 specifications. Section 5.5 of the Costco Structural Packaging Specifications, with which

22 SFP acknowledged it must comply, state clearly under the applicable heading (General

23 Delivery Pallets, Non-Rental, For North America) as follows:

24          [83]Appendix at Exhibit B (Scott Dep.), 103:1-14, 105:14-18, 106:5-9, 108:24-14.

25     [84] Nothing in the portions of Scott's testimony cited by SFP changes his testimony which
establishes beyond a shadow of a doubt that he (and SFP) knew the company was required to
26 complay with Exhibit 16.

27          [85]Appendix at Exhibit 16 bears control numbers SWFP 000218-221.

28

5.5.3 (B) Lumber:
-New (not recycled)
-Standard grade or better
-**Softwood must be kiln-dried**[86]

It is undisputed that the wood used to construct the pallets here was "softwood."[87]  It is also undisputed that SFP did not kiln-dry the wood before constructing the pallets.[88]

Even McCarron, who sold the pallets to NBTY, recognized the breach when he testified:

> Q. – Now, you're with [sic] the guy that sold these pallets to NBTY; correct?
>
> A. - Correct.
>
> Q – And based on everything you know, the customer didn't get what it paid for, correct?
>
> [Form Objection by SFP's Counsel]
>
> A – Correct.[89]

Accordingly, NBTY has established – as a matter of law – that SFP breached the applicable contract.[90]

SFP tries desperately to undermine McCarron's testimony.  SFP cites a snippet of McCarron's testimony for the assertion that he did not have any experience in the lumber

---

[86]Appendix at Exhibit 16 (SWFP000220) (emphasis added).

[87]Appendix at Exhibit B (Scott Dep.), 67:11-19.

[88]Appendix at Exhibit C (Steve Dep.), 33:20-34:7.

SFP's obfuscation continues in its discussion at section B (1)(c), *supra.* There, SFP, implicitly recognizes the problem created by its admission that it was required to comply with the "kiln-dried" term of the contract but urges that this requirement is a "red-herring."  This argument is nothing more than a re-hash of the argument in Section B(1)(a) that Exhibit 16 was not a part of the contract.  This argument does not become better simply because SFP repeats it. time of delivery." specifications.

[89] Appendix at Exhibit A (McCarron Dep.), 56:9-15.

[90] In Section E (1), *infra.*, SFP claims NBTY has no admissible evidence of damages.  In Section E(2), *infra.*, NBTY not only debunks this assertion but demonstrates the opposite, namely the undisputed facts show that NBTY suffered damages in the amount of $109,279.29.

industry.  It is clear from that testimony that McCarron meant he had only 13 months in the pallet manufacturing industry.  He later testified that he was worked for Las Plumas Lumber for 23 years and, at the time of his deposition, was working with Parr lumber.[91]  It cannot dispute that McCarron was a Vice President with the company.  For the company to come back now and argue that McCarron was not sufficiently knowledgeable about the company's business or products to testify to the facts adduced in this case defies credulity.  McCarron does not speculate that "pallets sat at the scales for a couple days".  He was the one who had to deal with that issue.  He does not speculate about the custom and practice that SFP cut trees, built pallets and shipped those pallets within the same week. He does not speculate that the loads he personally witnessed being delivered were not dry.  He does not speculate that the plan was to air dry the pallets on the way to California.  He does not speculate the customer did not get what it paid for.  After all, he was the company Vice President who handled the entire transaction until he was told to butt out after the problems arose. SFP hired McCarron and gave him authority to make deals on its behalf.  They gave him all the training the company thought he needed.  His prior experience is the lumber industry is certainly relevant.   Here, among the key witnesses, he is the only one who does not work for one of the parties.  There is simply no basis for the request to strike or ignore his testimony.

> ### b.   Undisputed Facts Preclude Judgment in SFP's Favor on the Breach of Contract Claim.

As set forth in Section 2(a), *supra,* NBTY has established it is entitled to judgment on the breach of contract claim based on SFP's admitted failure to comply with the "kiln-dried" term.   Whether or not the Court agrees with NBTY, at a minimum, the facts presented in support of NBTY's position raise a triable issue of fact precluding summary judgment for SFP.

---

[91]  SFP's cited testimony is at footnote 74.  McCarron expands on his duties and experience later.  Appendix at Exhibit A (McCarron Dep.). p. 100:13-22.

1    Given that NBTY has established it is entitled to summary judgment because the

2 pallets were not constructed with kiln-dried wood, SFP's entire discussion of the

3 "moisture content" issue is irrelevant.  Although NBTY will raise the "moisture content"

4 issue at trial, NBTY recognizes that disputed issues of fact preclude judgment for either

5 party based on an alleged breach of the "moisture content" term. By way of example

6 only, all three SFP representatives acknowleged the contract required the pallets to have

7 an estimated moisture content no greater than 19%:

8              Q – So, if I'm an NBTY representative, and I read the
9              spec that you - - your company sent to them in
              connection with the purchase of pallets, Costco block
10             pallets from your company, it would be reasonable of
              me to assume that the moisture content at delivery of the
11             pallets that I purchased was 19 percent, correct?

12
13             A – Correct.[92]

14 And, Joe McCarron, admitted that SFP did not get the dry pallets it paid for.

15             Q – And describe in your own words what was different about
16             what NBTY received from Southwest Forest Products as
              compared to what they ordered from Southwest Forest
17             Products.

18             A -  What I saw delivered to NBTY was a heavy wet pallet and
19             not a quote, unquote dry pallet.[93]

20 This testimony alone raises disputed issues of fact on the "moisture content" question.

21    But wait, there's more.  McCarron also testified that the pallets were built from

22 trees that had been cut that same week making them "wet" to start[94], that the pallets were

23

24        [92]Appendix at Exhibit B (Scott Dep.), p. 99:4-10.  And, SFP's assertion – at pages 7 and
25 8 – that NBTY does not assert that the PDS specifications are part of the contract is wrong.
NBTY alleged in the complaint that this document was approved as part of the purchasing
26 course of dealing complaint Ex. 12.

27        [93] Appendix at Exhibit A (McCarron Dep.), pp. 29:9-32:17.

28

- 29 -

1  supposed to air-dry on the way to California[95], that the initial shipment went in a closed
2  van and not an open flat-bed[96], that the shipment was stopped at the weigh station
3  because the excessive moisture in the pallets made them overweight, that air-drying was
4  not a standard parctice[97], that Scott told McCarron that Steve was "chewing his ass"
5  repeatedly because of the problem with the NBTY pallets.[98]

6      SFP also relies heavily on Steve's testimony that he personally inserted a moisture
7  meter on a daily basis into each pallet (over 2000) after manufacture but before shipment
8  and that the moisture content of every single pallet was 16%.  If this Court denies
9  NBTY's motion for summary judgment, this Court can make its own conclusion about
10 this testimony.  For purposes of this motion, it is sufficient to raise a disputed issue of
11 fact to note that SFP has no documentation of the alleged tests, no written testing
12 procedures and that NBTY was the first customer to ever order "dry" pallets.[99]  Most
13 telling is this exchange with Steve:

14          Q – When did you first know that NBTY
15          was a customer of your company's?

16          A – When I authorizeed they be given full
17          credit for their concerns about our
           product.[100]

18  ───────────────────────────────
19  [94] Appendix at Exhibit A (McCarron Dep.), p. 25: 2-8 ("the pallets were so wet from being cut from the forest because Southwest Forest Products harvest their own timber, cut them from the forest, cut it into pallets and put them in the truck within the same week.").

20  [95] Appendix at Exhibit A (McCarron Dep.), p. 22:2-20 "[Scott] explained to me that [the
21  pallets] would be dry by the time they got to California because we were shipping them on a flatbed truck and trailer.  And the five-six hour transit would dry the pallets.")

22  [96] Appendix at Exhibit A  (McCarron Dep.), p. 22:15-20 ("And we ended up shipping them in a van, in a closed van.  And after this situation, after the first mold came about, I was
23  told by Scott we were not to ship any more new pallets in an enclosed van, which we liked to do because the enclosed vans were much cheaper than the flatbeds.").

24  [97] Appendix at Exhibit A (McCarron Dep.), p. 55:3-7 ("I never heard of that [air drying
25  pallets on the way from AZ to CA] except for that one time.").

26  [98] Appendix at Exhibit A (McCarron Dep.), pp. 22:21-23:2.

    [99] Appendix at Exhibit C (Steve Dep.), pp. 15:9-16:24, 20:8-12.

27  [100] Appendix at Exhibit C (Steve Dep.), p. 23:20-23.

28

1

2   So, Steve had no idea that NBTY was even a customer until after the problem arose.  Yet,

3   he claims to have tested every single pallet for moisture content.  At the very least,

4   NBTY is entitled to an inference that Steve did not do this testing.  He had no idea

5   NBTY was even a customer.  How would he even know what specfications he was

6   testing against?[101]

7          Thus, SFP is just plain wrong when it asserts:  "The operative question, therefore,

8   is what did the contract say about the moisture content of the pallets?" (See text Section

9   B(1)(a), *infra*.).  The operative questions are whether the contract required delivery of

10  made from "kiln-dried" wood pallets and whether SFP delivered them.  The contract does

11  and SFP did not.  Accordingly, NBTY is entitled to judgment in its favor on the breach of

12  contract claim.  SFP is not.

13          **C.      Count Two – Breach of Covenant of Good Faith and Fair Dealing.**

14                  1.      Defendant's Position: The Breach of Covenant of Good Faith and Fair
                            Dealing Claim Is Simply Duplicative of the Breach of Contract Claim
15                          and Fails as a Separate Cause of Action.

16          As discussed above, Plaintiff's claim for breach of the covenant of good faith and

17  fair dealing is duplicative of the contract claim. Plaintiff alleges only that Defendant

18  "unfairly interfered with Plaintiff's right to receive the benefits of the Contract by selling

19  Plaintiff defective pallets." Other than setting forth this allegation in a separate count,

20  there is nothing that distinguishes this claim from Plaintiff's breach of contract claim. To

21  state an independent cause of action, a claim for breach of the covenant of good faith and

22  fair dealing must allege something more than what is required to support a breach of

23  contract claim—*e.g.*, that the defendant "had exercised a right malevolently, for its own

24  gain, as part of a purposeful scheme designed to deprive the plaintiffs of the benefits of

25

26  _____

        [101]   *See, e.g., Ryan v. Ltd. West, Inc.,* 2007 WL 4577867 *3 (C.D. (al. 2007) (party
27  opposing summary judgment entitled to all reasonable inferences)

28

1  the [contract]."[102] Where, as here, the good faith and fair dealing claim depends entirely
2  on the contract, in other words, it does not survive as a separate cause of action.[103]

3       NBTY's argument that New York law recognizes the implied covenant of good
4  faith and fair dealing in all contracts does not give vitality to the good faith and fair
5  dealing claim. Although New York, like most states, recognizes an implied covenant of
6  good faith and fair dealing in every contract, the relevant question is not whether New
7  York law recognizes the covenant in the abstract, which it clearly does, but rather
8  whether New York law permits recovery for breach of the covenant based on the specific
9  facts before the Court. Because NBTY fails to distinguish the factual basis for its
10 covenant-based claim, other than to say it is not based on the identical express written
11 terms, and the claim is otherwise wholly duplicative, this claim fails as a matter of law.

12            2.    NBTY's Position.

13 SFP completely misses the mark here.

14        In New York, all contracts imply a covenant of good faith and
15        fair dealing in the course of performance (citations omitted).
16        This covenant embraces a pledge that neither party shall do
          anything which will have the effect of destroying or injuring the
17        right of the other party to receive the fruits of the contract
18        (quotations and citations omitted). While the duties of good
          faith and fair dealing do not imply obligations inconsistent with
19        other terms of the contractual relationship (quotations and
20        citations omitted) they do encompass "any promises which a
          reasonable person in the position of the promisee would be
21        justified in understanding were included (quotations and
22        citations omitted).[104]

23       _____
24       [102] *Richbell Information Services, Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302,
         765 N.Y.S.2d 575 (1st Dept. 2003).

25       [103] *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F. Supp. 808, 815
         (S.D.N.Y. 1994) (A party breaches the implied duty of good faith and fair dealing where that
26       party does something to "destroy or injure the rights of another party to receive the benefits of
         the contract").

27       [104] *511 West 232nd Owners Corp. v. Jennifer Realty Co.* (2002) 98 N.Y.2d 144, 153-54.

28

Here, SFP claims there are no disputed issues of fact regarding whether or not it breached express terms of the contract.  NBTY has demonstrated not only that it is entitled to summary judgment because SFP did not kiln-dry the wood as required by the express written contract, but that many disputed issues of fact preclude summary judgment on the "moisture content" issue.

Under New York law, "all contracts contain an implied agreement that neither party may engage in conduct which would interfere with the other party's right to realize the benefit of the bargain, even if such conduct is not specifically prohibited by the contract . . . Consequently, a party may breach the implied covenant of good faith and fair dealing even if that party's conduct does not contravene the express provisions contained within the four corners of the written agreement."[105] Whether or not SFP breached an express term, NBTY has proffered evidence that, at a minimum, raises a disputed issue of fact on the question of whether SFP delivered "dry" pallets which all concerned admit were ordered by NBTY. In fact, SFP, through McCarron, admitted that the pallets were not "dry."[106] Thus, this claim is not duplicative because it is based on the testimony that NBTY did not get the benefit of its bargain.  It did not get dry pallets. Whether the pallets were kiln dried is irrelevant to this claim.  The claim is that the pallets were not "dry" as that term is used in the industry.  Whether or not a specific moisture content term was included in the contract or whether Steve stuck a moisture meter in each of 2,132 pallets is also irrelevant to this claim.  The specific contract terms – other than the admitted agreement that "dry pallets" were required - are not at issue in this claim so there is no duplication.

---

[105] *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.* (S.D.N.Y. 2005) 361 F.Supp.2d 283, 298 (internal quotations and citations omitted).

[106] Appendix at Exhibit A (McCarron Dep.), pp. 29:9-32:17.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.**   **Counts Three and Four – The Breach of Warranty Claims.**

1.   Defendant's Position: Plaintiffs' Breach of Warranty Claims Fail for Lack of Evidence.

Plaintiffs have asserted claims for breach of the implied warranty of merchantability and implied warranty of fitness for a particular purpose. The central thrust of Plaintiffs' warranty claims are that "the pallets contained an excessive amount of moisture causing mold to grow on the pallets and the display materials." Because Plaintiffs has not shown that the pallets contained "an excessive amount of moisture" or that this "caused mold to grow," as discussed above, both claims necessarily fail as a matter of law.

Under New York law, the warranty of merchantability is implied in every sale of goods, if the seller is a merchant with respect to goods of that kind, unless the warranty is excluded or otherwise modified.[107] To satisfy the implied warranty of merchantability, the goods must be "fit for the ordinary purposes for which such goods are used."[108] "Merchantable quality" generally means that the article is reasonably fit for the ordinary uses for which it was manufactured and need only be of "medium quality or goodness."[109] Plaintiffs have not presented any evidence that the pallets, when delivered, were not reasonably fit for ordinary use for which they were manufactured as pallets. Mere speculation that the pallets suffered from an inherent problem or defect that subsequently caused "mold" to grow on them (after sitting in NBTY's warehouse for weeks) does not support the breach of warranty claim.

Even if the pallets contained "excessive moisture," whatever that means, this fact does not render the pallets unfit for the ordinary purposes for which they are used. The implied warranty of merchantability does not require that the goods be the best quality.

---

[107] NY UCC § 2-314.

[108] NY UCC § 2-314(2)(c).

[109] *Schwartz v. Marcose Lumber*, 50 Misc. 2d 547, 270 N.Y.S.2d 875 (1966).

- 34 -

Again, they only need be of "medium quality or goodness."[110] Pallets are ordinarily made for the transportation of goods. There is no indication that alleged "excessive moisture" or discoloration interfered with that ordinary use or rendered them defective.

NBTY's claim for breach of the implied warranty of fitness for a particular purpose, likewise, fails as a matter of law. The implied warranty of fitness for a particular purpose arises where the seller at the time of contracting has reason to know the particular purpose for which goods are required and that the buyer is relying on the seller's skill and judgment to select or furnish suitable goods.[111] Although SFP knew the particular purpose for which the pallets were required, NBTY did not rely on SFP's skill and judgment to select or furnish suitable goods. Rather, Plaintiff ordered particular pallets and instructed SFP what they wanted. Moreover, although NBTY now contends that it needed kiln-dried pallets, they never conveyed this requirement to SFP.

In addition to failing to present any evidence that the subsequent "discoloration" that appeared on the pallets and product displays was caused by a flaw inherent in the SFP pallets, clearly a fatal flaw to any warranty claim, NBTY testified that it did not know whether Costco would have rejected the SFP pallets.[112] Thus, there is no evidence that air-dried pallets were not fit for their intended purpose. In fact, NBTY's 30(b)(6) designee testified that Costco had, in the past, accepted product displays set on discolored pallets. Finally, because Costco did not have any moisture content requirements for its pallets, SFP had no reason to know that its pallets would not be fit for use at Costco stores based on the Costco specifications

---

[110] *Schwartz*, 50 Misc. 2d 547, 270 N.Y.S.2d 875 (1966); *U.S. Leasing Corp. v. Comerald Associates, Inc.*, 101 Misc.2d 773, 421 N.Y.S.2d 1003 (1979) ("Merchantable quality means that the article is reasonably fit for the ordinary uses for which it was manufactured and need only be of 'medium quality or goodness.'").

[111] NY UCC § 2-315.

[112] Appendix at Exhibit E, p.47:ll.10-25, p.48:ll.2-4..

1    In sum, the evidence of record is insufficient to create a genuine issue of material

2    fact on either of the implied warranty claims. The allegations that the pallets "were wet

3    and cause[d] mold to grow" are insufficient as a matter of law to sustain a warranty

4    claim.

5              2.    NBTY's Position.

6          On the breach of warranty claims, the Kraft Moldy Pallet case is virtually "on all

7    fours" with ours.  SFP does not appear to dispute the applicability of the warranty to our

8    facts.  Instead, SFP claims there are no disputed issues of fact on the question of breach

9    of this warranty.  But, SFP misapprehends the nature of the warranty.  In the Kraft Moldy

10   Pallet case, the court noted Georgia law's requirement that "to prove a breach the

11   plaintiff must show the goods had a latent defect at the time of sale that was not

12   discoverable by the exercise of caution on his part."[113]   New York law has the same

13   requirement.[114]  As in the Kraft Moldy Pallet case, NBTY has submitted evidence from

14   which a reasonable trier of fact could conclude that the pallets were not usable based on

15   the "mold" that appeared on them.  The photographs and testimony from eye witnesses is

16   sufficient evidence from which a fact-finder could make this determination.   Coupled

17   with McCarron's testimony that the pallets which were ordered were "dry" and the

18   pallets which were delivered were "not dry," NBTY has raised a triable issue of fact on

19   the claim for breach of warranty of merchantability.

20         As to the "fitness for a particular purpose" warranty, once again, the Kraft Moldy

21   Pallet case is instructive.  There, the court found triable issues of fact on whether or not

22   Kraft relied on the pallet seller's skill and judgment.  Here, NBTY testified specifically

23   _____

24         [113]   845 F.Supp.2d at 1356.

25         [114]   *See, e.g.*, *Milcor Steel Co. v. Grantier* (N.Y. Co. Ct. 1942) 34 Misc.2d 496, 497
     (question of fact precluded summary judgment on warranty of merchantability claim when rust
26   appeared 4 years after installation): *Martin v. Chuck Hafner's Farmers' Market, Inc.* (N.Y. App.
     Div. 2006) 28 A.D.3d 1065, 1066 (triable issue of fact on breach of implied warranty of
27   merchantability based on plaintiff's claims of injury arising out of breathing in "moldy straw")

28

                                                    - 36 -

that it relied on SFP to know the Costco specifications.[115]  And, all of the evidence presented raises a triable issue of fact on the question of whether NBTY relied on its pallet suppliers' skill and judgment to supply it with a "dry pallet."  Once again, McCarron's testimony that the customer did not get the dry pallets it ordered suffices to raise a disputed issue of material fact.[116]

**E.     Damages.**

        1.    <u>Defendant's Position: Plaintiff Has Not Disclosed Any Evidence of Actual Damages Sufficient to Overcome Summary Judgment</u>.

A buyer's damages for breach of contract include the cost of purchasing replacement goods, or cover, as well as consequential and incidental damages.[117] However, NBTY has not disclosed any admissible evidence of damages.

The entirety of Plaintiff's evidence of damages in this case consist of (a) a spreadsheet detailing its alleged damages and (b) copies of alleged purchase orders that it contends represent the pallets it purchased in October 2010 as cover.[118] The spreadsheet is hearsay and not best evidence, and therefore is not admissible at trial or on summary judgment.[119] To the extent it attempts to serve as a summary, NBTY never disclosed the underlying evidentiary support for the summary—*e.g.*, the invoices, time cards for the associates, etc.—and, therefore, it is not admissible at trial.[120]

NBTY has also presented no evidence that it actually *paid* any of these amounts. In order to prevail on its breach of contract claim, NBTY must show that they actually incurred, and paid, the amounts it is claiming as damages and not simply some inchoate

---

[115] Appendix at Exhibit D (Quinton Dep.), pp. 110:22-111:2.

[116] Appendix at Exhibit A (McCarron Dep.), p. 32:8-11 (Q – "…did NBTY receive what it ordered from Southwest Forest Products? A – No.").

[117] NYUCC §§ 2-712, 2-714, 2-715.

[118] Appendix at Exhibits 18 and 20.

[119] *In re Slatkin*, 310 B.R. 740, 744 (C.D. Cal. 2004) ("Inadmissible hearsay cannot be considered on a motion for summary judgment").

[120] *Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313 (C.D. Cal. 2004) (failure to disclose evidence supports grant of summary judgment).

1  possibility of damages.[121] Although NBTY produced what purport to be proposals or
2  purchase orders for some of its alleged substitute and replacement goods, they never
3  produced any of the invoices they actually incurred or paid. Purchase orders are not proof
4  of actual delivery or payment. Indeed, purchase orders can easily be prepared, but never
5  sent. And there is no indication that the purchase orders were actually sent in this case. In
6  the absence of such competent evidence of damages, of course, NBTY cannot prevail in
7  this case.

8      NBTY's reliance on *Menorah Home and Hospital v. Fireman's Fund Insurance
9  Company*,[122] is misplaced for several reasons. In *Menorah*, the Eastern District of New
10 York ruled that invoices were not hearsay and, therefore, were sufficient to overcome
11 summary judgment based on lack of damages. As an initial matter, the admissibility and
12 sufficiency of NBTY's evidence on damages to overcome summary judgment "is a
13 procedural matter guided by federal law."[123] Even if New York substantive law applied,
14 however, it is clear that spreadsheets and documents purporting to be electronic copies of
15 purchase orders are insufficient to defeat summary judgment.

16     Unlike in the *Menorah Home* case, the evidence in this case does not consist of
17 invoices, but rather, what purport to be mere "screenshots" of purchase orders.[124]
18 Whereas an invoice represents an actual purchase made, a purchase order represents
19 nothing more than a mere offer to buy. "[T]he mere existence of the Purchase Order
20 shows only the existence of an offer….The Purchase Order is not, by itself, proof of a

21

22  [121] *Luna v. Sears Life Ins. Co.*, 2008 WL 2484596 (S.D. Cal. 2008) (damages must be
    "actually incurred" in order to be claimed as damages and supported by "documentation of
23  contractual obligation, invoice or payments"); *see also Bishop v. Hyundai Motor Amer.*, 44
    Cal.App. 4th 750, 755-56 (1996) (construing UCC § 2-715 as applying only "in the context of
24  monetary losses actually incurred").

25  [122] 2011 WL 6337640 (2nd Cir. 2011).

    [123] *Hudson Ins. Co. v. Ovitt*, 879 F.2d 865 (9th Cir. 1989).
26
    [124] Appendix at Exhibit D (Quinton Dep.), p. 96: ll.20-24 (the document is "[s]imply a
27  screenshot oout of our accounting system…"), p. 97:ll.7-22.

28

- 38 -

contract."[125] A purchase order is "at best merely an offer or a counteroffer, and its retention by the seller without objection may not be deemed ratification of, or acquiescence to, the terms which it contained."[126] In contrast to the *Menorah Home* case, NBTY has offered no evidence of the invoice showing contract acceptance or delivery of the goods that would obligate NBTY to pay for the pallets. Even assuming that the document that NBTY contends is a purchase order for replacement pallets is a business record, it is insufficient to constitute competent, admissible evidence of actual damages. Unlike the invoices in the *Menorah Home* case, the purchase orders in this case are simply evidence of a proposed purchase, not an actual purchase.

Rule 26 mandates the automatic disclosure of "the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation [of damages] is based, including material bearing on the nature and extent of injuries suffered." This is particularly true where, as here, Plaintiff has failed to produce it within the discovery period.[127] Thus, NBTY cannot justify its failure or refusal to produce the actual invoices, if they exist, based on the alleged absence of a specific request. SFP, however, did make specific requests for such documents:

> Please produce all documents relating to your claims that you were damaged in the amount of $109,279.29 by SFP's pallets.[128]

Despite objecting that the term "relating to" was somehow "overly broad," NBTY insisted that it has "already produced all such documents."[129] Counsel for SFP followed up SFP's response in a letter dated July 17, 2012:

---

[125] *D.J.C. Group Corp. v. Woolrich, Inc.*, 1995 WL 662123 (S.D.N.Y. Nov. 9, 1995).

[126] *Albrecht Chemical v. Anderson Trading Corp.*, 289 N.Y. 437, 439 (1949); *see also Menendez v. Faber, Coe & Gregg, Inc.*, 345 F. Supp. 527, 563 (S.D.N.Y. 1972) ("It is well-settled that a purchase order is an offer to enter into a contract").

[127] Fed. R. Civ. P. 37(c)(1); *Westerdahl v. Wiliams*, 276 F.R.D. 405 (D. N.H. 2011) (disclosure of evidence after the discovery cutoff "was not harmless because it came after the discovery cutoff").

[128] Appendix at Exhibit 26 (SFP's Request for Production of Documents), p. 4

Although you contend that you provided a "quotation," we are entitled to all documents relating to your claim that you were damaged, including but not limited to invoices, bills of lading, or other documents showing that your client actually bought replacement pallets for the price you allege. Obviously, we are not expected to rely solely on your allegations in this case and therefore ask for…all documents "relating to" your damages. Your objection that the term "relating to" is over broad is without merit.[130]

Yet, no additional documents "relating to damages," such as "invoices, bills of lading, or other documents showing that [NBTY] actually bought replacement pallets, were produced." Counsel for SFP also included the topic of damages, "not limited to the factual basis and calculation of your damages" in its Rule 30(b)(6) Notice of Deposition.[131] Counsel for SFP explored the location of such evidence at the 30(b)(6) deposition of NBTY. The following exchange took place:

Q.     Okay. So in order to create this spreadsheet, you had to be looking at different documents…in order to come up with these values here in column C?

A.     Yes.

Q.     One of those documents you looked at was a Southwest Forest Products invoice; correct?

A.     Yes.

Q.     One of those numbers that you looked at, one of those documents, was something from Commercial Lumber; correct?

A.     Yes.

Q.     And what was that that you looked at from Commercial Lumber?

A.     Would have been invoice copies.

Q.     Okay. So you looked at invoice copies from both companies and essentially did the math and figured out the difference; right?

A.     Yes.

---

[129] Appendix at Exhibit 25 (NBTY's Response to Request for Production fo Documents), p. 5.

[130] Appendix at Exhibit 24 (letter from J. Dessaules to M. Leb dated July 17, 2012), p. 2.

[131] Appendix at Exhibit 23 (Fourth Amended Notice of Rule 30(b)(6) Deposition).

* * *

Q.   But the purchase order and the invoice would demonstrate that you actually purchased what's in the quotation from Commercial Lumber; correct?

A.   I would have to go back and review those documents.

Q.   Okay. Those documents aren't in front of you, are they? ... You haven't seen them yet; correct?

Why don't you thumb through the rest of them and see if you can see the Commercial Lumber documents, the invoice, the purchase order, the quotations?

A.   I do not see them here.

Q.   Okay. So as you sit here today, you can't tell me how much you paid to Commercial Lumber when—or any of that based upon the documents in front of you correct?

A.   I cannot give you exact amounts without going back and looking at those documents.[132]

SFP has been requesting the documents since the inception of this case. The discovery period in this case is now over and SFP has been effectively deprived of the opportunity to ask questions regarding the alleged damages. Yet, NBTY now seeks to fix the deficiencies that have existed for months by submitting self-serving declarations. Of course, the declarations are hearsay and not the best evidence and should be stricken on these grounds, especially since all that they really say is that she reviewed the purchase orders and the summary. As of the discovery cut-off, and as recently as November 29, 2012, NBTY still had not produced the invoices. Where are the invoices?[133] This is a case involving "cover" damages—*i.e.*, actual damages allegedly incurred following a breach of contract as opposed to damages such as pain and suffering. Offering declarations to say what presumably invoices should show does not solve these evidentiary flaws. Where

---

[132] Appendix at Exhibit D (Quinton Dep.), p.101:l.9 – p.102: l.3; p.130:ll.7-19.

[133] This issue was raised at the 30(b)(6) deposition: "it's very clear to me that there's a number of documents out there that there that we have not received yet." Appendix at Exhibit D, (Quenton Dep.), p.136:ll.11-13.

1  was Ms. Colbert or Mr. Ash when SFP asked to depose the person most knowledgeable

2  with respect to damages?

3     It is too late for NBTY to cure these deficiencies. SFP's counsel asked repeatedly

4  for the actual evidence of damages and, in Exhibit 24, spelled out exactly what was being

5  requested—invoices and other proof that NBTY actually acquired and purchased

6  replacement products. NBTY made a calculated decision not to produce the documents;

7  it was certainly not mere oversight. The failure to produce these documents within the

8  time frame authorized by the Court's scheduling order compels their exclusion under

9  Rule 37(c)(1), especially since it prevents SFP from actually conducting further

10  discovery, and cross-examination, of the evidence.[134]

11                      2.   NBTY's Position.

12     The accompanying Declarations[135] and evidence cited therein provides all the

13  evidence this Court needs to conclude that NBTY actually incurred the expenses it claims

14  as damages on its claim for breach of contract.  SFP apparently believes documentary

15  evidence is required to prove damages although it cites no cases to support this assertion.

16  Although NBTY has sufficient, admissible documentary evidence, this declaration

17  testimony alone is sufficient.  *See Phoenix Payment Solutions, Inc. v. Towner* 2009 WL

18  3241788 (D. Ariz., Oct. 2, 2009) (testimony that the plaintiff invested more than

19  $1million dollars was sufficient evidence of damages).[136] These damages, totaling

20

21  ───────────────
   [134] *Westerdahl*, 276 F.R.D. at 410 (D. N.H. 2011) (disclosure of evidence after the
   discovery cutoff "was not harmless because it came after the discovery cutoff"); *Williams v.*

22  *City of Bremerton*, 2001 WL 36101298 (W.D. Wash. 2001).

      [135] Appendix at Exhibit 28-32, 34.

23
      [136] Cases cited therein include *Sarwick Motor Sales, Inc. v. Husband*, 5 Ariz.App. 304,

24  426 P.2d 404, 407–08 (Ariz.Ct.App.1967) (plaintiff's testimony regarding the value of his
   property sufficient to support verdict for actual damages); *Jackson v. Pressnell*, 19 Ariz.App.

25  221, 506 P.2d 261, 262 (Ariz.Ct.App.1973) (same); *see also Gorman v. Wolpoff & Abramson*,
   LLP, 552 F.3d 1008, 1033 (9th Cir.2009) (plaintiff's testimony regarding harm resulting from

26  negative credit reports was "sufficient evidence of causation and damages to survive summary
   judgment"); *Crowe v. BellSouth Telecomms., Inc.*, No. 3:08cv179–WC, 2009 WL 1850189, at

27  *4 (M.D.Ala. June 26, 2009) (same).

28

                                    - 42 -

1  $109,279.29, were amounts paid to vendors for replacement materials and labor costs
2  associated with disposing of the contaminated and rebuilding displays.  At a minimum,
3  this evidence is sufficient to preclude summary judgment for NBTY on this issue.

4       SFP's argument that NBTY does not have sufficient evidence of damages because
5  NBTY 's documentary evidence consists of printouts of computer records and a summary
6  spreadsheet is specious for many reasons.

7       First, the identical argument was slapped down in *Menorah Home and Hospital v.*
8  *Fireman's Fund Insurance Company*, 2011 WL 6337640*2 - 4 (2nd Cir. 2011).   The
9  Second Circuit affirmed denial of a Rule 50 (b) motion for judgment where defendant
10 sought to exclude evidence of damages including invoices and a spreadsheet.   SFP's
11 attempts to distinguish this case fail.   SFP is apparently, under the misimpression that
12 neither the trial court, nor the Second Circuit, applied the Federal Rules of Evidence.
13 But, most of the opinion discussed the hearsay exception  - FRE 803(b)(6) - for "business
14 records" which is applicable to the documents supporting NBTY's damages calculation.

15      Second, the cases cited by SFP at fn. 125-126 for the proposition that a purchase
16 order, standing alone, is not a contract are inapposite.   NBTY relied on these purchase
17 orders in paying the amounts shown thereon to the vendors.   Here, there is no issue about
18 whether there was, in fact, a contract with any of those vendors.   These documents were
19 relied on in calculating the damages.

20      Finally, SFP argues that NBTY has, somehow, been duplicitous, withholding
21 documents vital to SFP's case. [137]   The record, however, shows the opposite.   NBTY

22
23 [137] Particularly misleading is SFP's citation and accompanying parenthetical (at footnote,
   , *supra*) of *Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313 (C.D. Cal.
24 2004) (failure to disclose evidence supports grant of summary judgment). The holding in this
   case was that a party's failure to disclose evidence to support an "alter ego" theory in reponse to
25 specific interrogatories precluded that party from submitting evidence on that issue. Those facts
   are so dissimilar to ours NBTY considers this citation to have been made in bad faith.

26      SFP's allegations of discovery "gamesmanship" are unavailing.   SFP never suggested
   that the witnesses produced under 30(b)(6) were not prepared to answer questions regarding
27 damages.   NBTY's counsel repeatedly sought to determine what more evidence SFP wanted to
28

- 43 -

1   provided a spreadsheet showing the basis for its damages in its initial demand letter to

2   SFP.[138]   And, NBTY produced backup documentation used to calculate the damages as

3   part of its initial disclosures.[139]   Finally, SFP's contention that it has "effectively deprived

4   of the opportunity to ask questions regarding the alleged damages" is hard to fathom.

5   The testimony cited by SFP comes from pages of deposition testimony regarding the new

6   materials purchased, the amounts charged for materials and labor, and the documents

7   supporting the calculations on the spreadsheet.[140]   Moreover, NBTY's initial disclosures

8   listed two witnesses, including Ms. Colbert (the Declarant here), as "damages witnesses."

9   SFP never sought their depositions.[141]

10      In sum, SFP's argument regarding an alleged insufficiency of evidence is the

11   classic "smokescreen" designed to muddy the record to distract the Court.   When the

12   smoke clears, however, the evidence establishes not only that SFP breached its contract,

13   but that the undisputed facts show NBTY incurred damages of  $109,279.29

---

14   see regarding the claimed damages.  Even as late as during the preparation of this motion, SFP

15   refused to "meet and confer" about this.  Appendix at Exhibit 33 (Leb Dec.)

16      [138] Appendix at Exhibit 11. The enclosure to this letter was the spreadsheet produced with

17   NBTY's initial disclosures.  Appendix at Exhibit 29 (NBTY 0015-16).  This spreadsheet, itself,
    is admissible as a business record (FRE 803(6)) because NBTY prepared it "to quantify . . the
    value of product that . . . had to be replaced."  Appendix at Exhibit B (Quintin Dep., 41:1-7)

18   Notably, SFP cites nothing for its incorrect and unsupportable assertion "it is clear that
    spreadsheets and documents purporting to be electronic copies of purchase orders are
    insufficient to defeat summary judgment."

19      [139] These documents are includes in the Appendix at Exhibits 30, 32, 33.

20      [140] These pages include pages 99 -114 of David Quinton's Deposition.  Appendix at

    Exhibit D.

21      [141] SFP did not request documents in its 30(b)(6) notice.  As evident from the exchange

22   between counsel during discovery, NBTY attempted to figure out exactly what additional
    documents SFP wanted as NBTY believed the documents it had produced were sufficient and

23   the request for "all documents relating to damages" is not specific.  NBTY had no intent to use
    any documents other than those produced. In an abundance of caution, NBTY has located and is

24   submitting herewith additional print outs from its electronic database that confirm the amounts
    of materials and labor ordered and paid for by the company.  If the Court believes the
    Declaration testimony of Ms. Colbert and the documents already produced are insufficient,

25   NBTY is willing to meet and confer with SFP in an effort to determine precisely what

26   documents SFP wants to see.  If the information exists in the computer database or elsewhere,
    NBTY will produce it.  Obviously, NBTY is not trying to withhold information that supports its

27   damages claims.  Most of it, as Ms. Colbert declares, is stored in various databases.

28

**III.     CONCLUSION.**

    **A.     Defendant's Conclusion.**

NBTY initially claimed that the pallets' moisture content exceeded the contract's moisture requirements, but it has presented no evidence that the pallets exceeded the industry standard of 19%. NBTY now claims that the pallets were not kiln-dried, but offers no evidence that the kiln-dried requirement was part of the contract at the time of contract formation or, if it was, how that requirement was material in the greater context of the lack of evidence that the pallets exceeded 19% EMC. NBTY deliberately withheld all admissible evidence of its so-called cover damages. NBTY now asks the Court to come to its rescue by sanctioning SFP for getting rid of the pallets after they were sitting outside exposed to the elements for months. NBTY's extensive reliance on the *Kraft Reinsurance* case[142] is misplaced, as the case is factually and legally distinguishable.  The pallets in those cases were to be heat-treated; no such requirement existed in this case. Most significantly, the plaintiff in the *Kraft* case retained an expert regarding mold growth to support its claim that mold originated from the pallets; NBTY opted against retaining any expert in this case. Although summary judgment was not appropriate in the *Kraft* case, the fundamental difference between the two cases is that NBTY has failed to gather and produce the evidence to support its claims. In light of the lack of evidentiary support and the numerous legal deficiencies in NBTY's claims discussed above, SFP is entitled to judgment as a matter of law.

    **B.     NBTY's Conclusion.**

This case was summed up nicely by McCarron when he testified as follows:

> Q – Did this company SFP Forest Products cut corners to make profits in your experience?
>
> [Form Objection by SFP's Counsel]

---

[142] 845 F. Supp.2d 1342 (N.D. Ga. 2011).

1
2
            A – In this instance, I believe they did.[143]

3    SFP representatives testified McCarron was an honest guy.  He knew the company cut

4    corners.  He was embarrassed by it but he told the truth.  This entire case has been SFP's

5    desperate attempt to avoid responsibility for its own mistake.  SFP believes that it should

6    not have to pay "cover" damages.  It thinks it was enough to take back the pallets without

7    charge.  Unfortunately for SFP, the law provides NBTY is entitled to the damages it

8    seeks.

9            NBTY has shown that "kiln-drying" softwood was an express term of the contract

10   and that SFP breached it.  NBTY is, therefore, entitled to summary judgment.

11           NBTY has also proffered specific evidence of the damages it sustained.   The

12   accounts payable manager confirms payments were made as set forth on the spreadsheet

13   created by the purchasing manager as part of his job.  SFP's discussion of the alleged

14   evidentiary deficiencies is much ado about nothing.  NBTY provided documents that

15   provided the basis for its damages calculations during discovery.  SFP deposed one

16   corporate designee and asked many questions on damages.  SFP did not indicate it

17   needed additional information from that witness nor any specific documents.  It did not

18   file a motion to compel additional documents.  This is a straightforward "cover damages

19   case."  Documents are not required to prove damages.  If SFP wanted to challenge the

20   veracity of the claimed expenditures, it could have. But, since it has no basis for doing so,

21   it grasps at straws to no avail.

22
23
24
25
26   _____

27           [143] Exhibit A (McCarron Dep.), p. 99:5-9.

28

1    NBTY asks this Court to grant its motion on the breach of contract claim and

2  award damages in the amount of $109,279.29 and to deny SFP's motion for summary

3  judgment.

4  DATED: November 30, 2012          Respectfully submitted,

5                                    CHRISTIAN DICHTER & SLUGA, P.C.

6                                    By:   /s/ Jonathan A. Dessaules

7                                          Jonathan A. Dessaules,
                                           Cal. Bar No. 214650
8                                          *Attorneys for Defendants*

9

10  DATED: November 30, 2012         LEB Dispute Resolutions

11

12                                   By:   /s/ Michael H. Leb

13                                         Michael H. Leb,
                                           Cal. Bar No. 123042
14                                         *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28